UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA and COMMONWEALTH OF MASSACHUSETTS *ex rel.* JOHN DOE, <br><br> *Plaintiffs*, <br> v. <br><br> JOHNSON & JOHNSON, DEPUY SYNTHES, INC., and DEPUY SYNTHES SALES, INC., <br><br> *Defendants*. | CIVIL ACTION NO.: 1:17–cv–11502–DJC <br><br><br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (b)(2)** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

## AMENDED COMPLAINT

Plaintiff–Relator John Doe ("Relator") hereby files this complaint on behalf of the

United States of America and the Commonwealth of Massachusetts to recover monies

wrongfully paid as a result of false claims caused by Defendants Johnson & Johnson and

various entities owned and/or controlled by Johnson & Johnson under the name DePuy

Synthes, and states as follows:

## INTRODUCTORY STATEMENT

1.      Plaintiff–Relator John Doe brings this action on behalf of the United States

of America under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et*

*seq.* ("Federal FCA"), and on behalf of the Commonwealth of Massachusetts under its

False Claims Act, Mass. Gen. Laws Ch. 12, §§ 5A, *et seq.* ("Massachusetts FCA"),

alleging that the Defendants Johnson & Johnson, DePuy Synthes, Inc., and DePuy

Synthes Sales, Inc. have violated these laws by making false statements, submitting false



and fraudulent claims, and by overbilling of federal and state health insurance
programs, including Medicare and Medicaid.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action under the Federal FCA,
31 U.S.C. §§ 3732(a), and 28 U.S.C. §§ 1331 and 1345 and has pendent jurisdiction over
the Massachusetts FCA state law claims pursuant to 28 U.S.C. § 1367. The Defendants
can be found in, reside in and transact business in this judicial district and acts
proscribed by the Federal FCA and Massachusetts FCA have been committed by the
Defendants in this judicial district.

3.      To Plaintiff–Relator's knowledge, jurisdiction over this action is not barred
by 31 U.S.C. § 3730(e) or Mass. Gen. Laws Ch. 12, § 5G: there is no civil suit or
administrative proceeding involving the allegations and transactions herein to which
the United States or the Commonwealth of Massachusetts is a party; there has been no
"public disclosure" of these allegations or transactions; and Plaintiff–Relator is the
"original source" of the information on which these allegations are based—Relator has
voluntarily disclosed to the United States and Commonwealth of Massachusetts the
information on which allegations or transactions in a claim are based before filing this
complaint and has knowledge that is independent of and materially adds to any
publicly disclosed allegations or transactions. Furthermore, the fact that many
thousands of claims presented to government healthcare programs (including Medicare
and Medicaid) were inaccurate in the manner described in this Complaint is a material
fact, which, if known to the United States and the Commonwealth of Massachusetts,

**Delaney Kester** LLP

would have caused those claims to be denied.

4.      Venue is appropriate as to the Defendants since the Defendants can be found in, resides in and transact business in this judicial district and acts proscribed by the Federal FCA and Massachusetts FCA have been committed by the Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732(a), venue is proper.

## PARTIES

5.      Plaintiff–Relator John Doe is an individual with a principal place of residence in Massachusetts. He brings this *qui tam* lawsuit as a "Relator" on behalf of the United States of America and the Commonwealth of Massachusetts.

6.      Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with a principal place of business in New Brunswick, New Jersey. J&J is a manufacturer, distributer, and seller of drugs, medical devices, medical supplies, and hygiene products. J&J regularly distributes, markets, and sells products in the Commonwealth of Massachusetts and maintains full time employees within the Commonwealth. In 1998, J&J acquired DePuy. In 2011, J&J merged DePuy with Synthes to create DePuy Synthes, Inc. and DePuy Synthes Sales, Inc.

7.      Defendant DePuy Synthes, Inc. ("DePuy Synthes") is a Delaware corporation with a principal place of business in Raynham, Massachusetts. DePuy Synthes is a manufacturer of medical devices and supplies and regularly sells its products in the Commonwealth of Massachusetts and maintains full time employees within the Commonwealth.

**Delaney**Kester LLP

8.      Defendant DePuy Synthes Sales, Inc. ("DePuy Synthes Sales") is a Massachusetts corporation with a principal place of business in Raynham, Massachusetts. DePuy Synthes Sales is a medical supply company that regularly distributes, markets, and sells products in the Commonwealth of Massachusetts and maintains full time employees within the Commonwealth.

## FEDERAL AND STATE HEALTH INSURANCE PROGRAMS

9.      The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare"), is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). Medicare was designed to be a health insurance program and to provide for, among other things, the payment of hospital services, medical services and certain medications for persons over sixty-five (65) years of age and others who qualify under the terms and conditions of the Medicare Program. Payments made under the Medicare Program include payment for services which are reasonable and medically necessary for the diagnosis or treatment of an illness or injury.

10.      The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer revenue. Medicaid was designed to assist participating

**Delaney**Kester LLP

states in providing, among other things, hospital and medical services and prescription drugs to financially needy individuals who qualify for Medicaid.

11.    The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, and the Civilian Health and Medical Program of the Veterans Administration ("CHAMPUS VA"), 38 U.S.C. section 613, provide benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired and deceased members. The program is administered by the Department of Defense and funded by the Federal Government. CHAMPUS pays for, among other items and services, tests and procedures and prescription drugs for its beneficiaries.

12.    The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, tests and procedures and prescription drugs for its beneficiaries.

## THE MASSACHUSETTS HEALTH SAFETY NET

13.    The Massachusetts Health Safety Net, created by Chapter 58 of the Acts of 2006, makes payments to hospitals and community health centers for health care services provided to low-income Massachusetts residents who are uninsured or underinsured.

14.    Massachusetts residents who are uninsured or underinsured and have incomes up to 150% of the Federal Poverty Level (FPL) may qualify for Health Safety

Net primary or secondary coverage. For residents with incomes above 150% and up to 300% of the FPL, the Health Safety Net may provide partial primary or secondary coverage, which includes a sliding scale deductible based on income. Low income residents who are enrolled in MassHealth, ConnectorCare, Medicare, or other insurance can qualify for Health Safety Net secondary for certain services not covered by their primary insurance. The Health Safety Net pays acute hospitals and community health centers based on claims, which are adjudicated to verify that the patient qualifies and the services are eligible for payment. Health Safety Net payment rates for most services are based on Medicare payment principles. An estimated 285,000 individuals benefited from Health Safety Net payments in 2016.

15.     The Health Safety Net is not insurance. It is a payor of last resort that provides access to essential health care services for low-income uninsured and underinsured Massachusetts residents and reimburses acute care hospitals and community health centers for allowable services provided to this population. The sources of funding for the Health Safety Net include assessment on acute hospitals' private sector charges, surcharge on payments by HMOs, insurers, third party administrators, and individuals, and offset funding for uncompensated care from the Medical Assistance Trust Fund. Like the Commonwealth Care Trust Fund, the Health Safety Net Trust Fund receives transfers of revenue from public funds of the Commonwealth, which can be made through a line-item appropriation.

**Delaney**Kester LLP

16.     For 2016, the Health Safety Net made $231 million in payments to hospitals in Massachusetts, including Hospital 1 and some or all of the other hospitals referenced below.

17.     Together, the programs described in paragraphs 9 through 16 shall be referred to as "Government Health Care Programs."

## FEDERAL ANTI-KICKBACK LAWS

18.     The Medicare and Medicaid Patient Protection Act, also known as "the Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupt medical decision-making and can result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of Government Health Care Programs, Congress enacted a prohibition against the payment of kickbacks in any form. The Anti-Kickback Statute was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

19.     In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail. *See* Social Security Amendment of 1972, Pub. L. No. 92-603, 241(b) and (c); 42 U.S.C.

**Delaney** **Kester** LLP

§ 1320a-7b. In doing so, Congress noted that the purpose of the Anti-Kickback Statute was to combat fraud and abuse in medical settings that "cheat[] taxpayers who must ultimately bear the financial burden of misuse of funds . . . [that] divert[] from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and that] erode[] the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs." H.R. Rep. No. 95–393, pt. 2, at 37, reprinted in 1977 U.S.C.C.A.N. 3039, 3047.[1]

20.    In 1987, Congress again strengthened the Anti-Kickback Statute to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

21.    The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good, service, or item for which payment may be made in whole or in part by a Government Health Care Program, which includes any state health program funded in part by the federal government. 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

22.    The Anti-Kickback Statute provides, in pertinent part:

---

[1] Through the amendments Congress sought to "give a clear, loud signal to the thieves and the crooks and the abusers that we [Congress] mean to call a halt to their exploitation of the public and the public purse." 123 Cong. Rec. S31767 (daily ed. Sept 30, 1997) (statement of Sen. Talmadge).

Delaney Kester LLP

(b) Illegal remunerations

* * *

    (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

        (A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or

        (B) To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

23.     A transaction may violate the Anti-Kickback Statute even when a payor's unlawful intent is not its exclusive intent. It is enough that "*any one purpose* of the remuneration may be to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program." OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 3, 2003) (emphasis added). In other words, even "a lawful purpose will not legitimize a payment that also has an unlawful purpose."

24.     In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in Government Health

DelaneyKester LLP

Care Programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per

violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid,

regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C.

§ 1320a-7a(a).

25.     The Anti-Kickback Statute not only prohibits outright bribes and rebate

schemes, but also prohibits any payment, gift, or other remuneration by a company to a

physician or other person which has as one of its purposes the inducement of the

physician to use the company's products or the inducement of the physician to

influence or recommend the use of the product.

26.     Compliance with the Anti-Kickback Statute is a precondition to

participation as a health care provider under Government Health Care Programs,

including Medicare. Moreover, compliance with the Anti-Kickback Statute is a *condition*

*of payment* for any claims for which Medicare reimbursement is sought. Every provider

who enters into a contract with Medicare specifically acknowledges in its provider

contract that the provider understands "that payment of a claim by Medicare is

conditioned upon the claim and the underlying transaction complying with such laws,

regulations and program instructions (including, but not limited to, the Federal anti-

kickback statute and the Stark law), and on the [provider]'s compliance with all

applicable conditions of participation in Medicare."

27.     Medicare claims for reimbursement of any goods or services that were the

subject of a kickback constitute false claims (see False Claims

Act discussion, *infra*). This is because compliance with the Anti-Kickback Statute is a

Delaney**Kester**LLP

precondition to participation as a health care provider under Government Health Care Programs, including Medicare. Moreover, compliance with the Anti-Kickback Statute is a condition of payment for any goods or services reimbursed by Medicare, including medical devices and related medical procedures using those devices.

28.     Furthermore, the Anti-Kickback Statute was amended, effective March 23, 2010, to expressly provide that: "In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." Consequently, any kickbacks paid on or after March 23, 2010, that caused reimbursement claims to be presented to the government for payment would result in actionable false claims regardless of the provisions of any provider agreement.

## FEDERAL FALSE CLAIMS ACT

29.     The Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of law for which the affected government party may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781.40 and $21,562.80.

30.     The Federal FCA, 31 U.S.C. § 3729(a)(2), makes "knowingly" making, using, or causing to be used or made a false record or statement to get a false or fraudulent claim paid or approved by the United States a violation of law for which the affected government party may recover three times the amount of the damages the government sustains and civil monetary penalties.

11

31.     The Federal FCA, 31 U.S.C. § 3729(a)(3), makes any person who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the affected government party sustains and civil monetary penalties.

32.     The Federal FCA, 31 U.S.C. § 3729(b), defines "knowing" or "knowingly" to mean that a person, with respect to relevant information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

33.     The Federal FCA, 31 U.S.C. § 3729(c), defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to the government, its representative, contractor, grantee, or other person if the government party in question (*i.e.*, the United States) provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

## MASSACHUSETTS FALSE CLAIMS ACT

34.     The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(1), makes "knowingly" presenting or causing to be presented to Massachusetts any false or fraudulent claim for payment, a violation of law for which the Commonwealth may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim.

**Delaney**Kester LLP

35.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5B(2), makes "knowingly" making, using, or causing to be used or made a false record or statement to get a false or fraudulent claim paid or approved by Massachusetts, a violation of law for which the Commonwealth may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim.

36.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5B(3), makes any person who conspires to defraud Massachusetts by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the affected government party sustains and a civil monetary penalty of between $5,000 and $10,000 per claim.

37.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5A, defines "knowing" or "knowingly" to mean that a person, with respect to relevant information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

38.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5A, defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to the government, its representative, contractor, grantee, or other person if the government party in question (*i.e.* Massachusetts) provides any portion of the money or property which is requested or demanded, or if the

**Delaney**Kester LLP

Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

## FACTUAL ALLEGATIONS

39.     Defendants are the world's largest conglomerates to manufacture spinal implants. In 2013, Defendants' estimated sales of spinal implants in the U.S. exceeded $2 billion. The majority of spinal implants and other spinal devices are used for spinal fusion surgery, with approximately 50% of spine surgeries being lumbar fusion and approximately 37% being cervical fusion, with very few thoracic fusions. This case concerns the submission of false or fraudulent claims to Government Healthcare Programs in connection with spinal implants, surgical tools and biologics sold by Defendants, including but not limited to fraudulent billing for:

(i)     Multi-use devices such as drills, taps (drill-like devices) and trials (temporary spacers);

(ii)    Items not actually used during surgery: including screws; and guidewires; and Jamshidis;

(iii)   The use and implant of Cortical fix screws when cheaper, regular screws were used;

(iv)    Set caps from more expensive systems (e.g. Expedium) whereas cheaper set caps had been used (e.g. from the Viper system); and

(v)     Biologics, such as ChronOS bone void filler and Confidence Spinal Cement, not actually used during surgery.

40.     In addition to billing fraud, Defendants also used kickbacks in the form of entertainment to induce purchase of their surgical products.

41.     Relator John Doe was a sales representative employed by Johnson & Johnson to sell spinal implant products. Relator began working for

**Delaney**Kester LLP

Johnson & Johnson in 2015 and is principally responsible for sales to Hospital 1 ("H1")
and works under Sales Representative 1 ("SR1"). Relator's former sales team are
responsible for several hospitals including: H1, H2, H3, H4 and H5. Both SR1 and
Relator acted as a liaison between Johnson & Johnson and physicians conducting spinal
surgeries in the operating room. In that capacity, Relator spent significant time actually
in the operating room itself.

42.     Relator sold spinal implant products in product lines such as the
Mountaineer Spine System, Expedium and Expedium Anterior Spine Systems, Cougar
cages and Cougar LS cages, Skyline Systems, XMesh cages and the Viper Spine System.
These systems include surgical screws designed to be compatible with the individual
systems' devices. DePuy Synthes also manufactures and sells biologics such as the
ChronOS bone void filler used to promote bone growth and post-surgical recovery.

43.     When Relator first started working with SR1, Relator had no knowledge or
experience of the supply chain and billing system that govern the sale of these products
to hospitals. Over time, however, Relator began to realize that not only was the system
open to abuse, it was routinely abused causing insurers and Government Healthcare
Programs to be overbilled for the use of DePuy Synthes products.

<u>THE SUPPLY AND PURCHASE PROCESS</u>

44.     The supply and purchase of these products is governed by contractual
agreements between Defendants and hospitals. Pursuant to their arrangements with
their customers, Defendants maintain an inventory of products on-site at the hospitals
they serve. Sales representatives such as Relator are stationed at hospitals armed with a

**DelaneyKester** LLP

stock of the most common spinal implant systems and necessary tools and parts. Based on the particular needs of each patient, sales representatives hand the specific medical devices and equipment to the hospital's surgical staff, who then organize and sterilize them so that there will be implants at the ready. At the start of the day, surgeons have a general idea of which implants they intend to use in upcoming surgeries, however, they often make last-minute decisions on precisely which size of screw, for example, should be used. Thus, it is only when the surgery is underway that it is known for certain which implants will be used, and it is only *after* the surgery is finished, that the sales representative can report to the hospital precisely which implants were used.

45.      The sales representative notes the implants used on a handwritten report, which is given to a nurse at the hospital. The sales representative also sends an electronic copy to the hospital business coordinator. This process drives the billing and restocking of products. The hospital business coordinator orders a restock of the items used, generally a one-for-one restock. The replacement devices and implants are delivered to the hospital and given to the sales representative, who replenishes the inventory.

46.      When Relator began to understand how the system is supposed to work, he realized that hospitals in his territory were being billed for products that had not actually been used during the surgery. This was evident because monthly sales ledgers purported to show sales of items that Relator knew had not been used; and the depleted inventory would be augmented with the most expensive devices whereas less expensive devices had been expended. This lead to a surfeit of more expensive items

Delaney Kester LLP

and a deficit of cheaper but more-commonly-used items. The discrepancy between what was actually used and what was reordered caused this imbalance. To cure the imbalance, Relator had to supplement the automatic restock orders with *ad hoc* orders for commonly used products whose numbers were dwindling. Meanwhile, the sales kits were overflowing with expensive products used only infrequently. In short, Government Healthcare Programs were paying for expensive items but were receiving cheaper hardware.

47.     Furthermore, Defendants expanded the fraudulent scheme to also cause hospitals to bill Government Healthcare Programs and other payors for multi-use tools. These reusable tools, including drills, taps and temporary spacers ("trials"), are used over and over again in multiple surgeries. Relator believes that Defendants had been billing for these items intermittently, but on or about March 4, 2016, Defendants, through their employee SR1, started billing for them regularly as if they were single-use tools. SR1 circulated the idea to Relator and Sales Representative 2 ("SR2") by text "Let's charge for drills and caps in all cases at [H2]. Thanks. If [SR2] gives the ok." SR2 responded: "Okay for every case." After this exchange Defendants began to bill unlawfully for these multi-use devices at multiple locations, including H1 and H2.

<u>SPECIFIC INSTANCES OF UNLAWFUL BILLING AT H1</u>

48.     As detailed below, Relator has reviewed a number of internal documents relating to H1 which evidence the overbilling alleged herein. Furthermore, Relator was witness to such overbilling, for example:

    (i)     Relator was present during a surgery conducted by Dr. #1 in which a single vial of Confidence Cement was used. However, according to Territory

Delaney Kester LLP

Invoice Product Detail of May 25, 2017, invoice number 11224699 shows that four vials were billed. The billing of 4 such vials, totaling $16,000, is unequivocally overbilling;

(ii)   Following a 3-level spinal surgery conducted by Dr. #2, SR1 billed for screws which had not been used during the surgery and were much more expensive then the screws actually used. The 12 screws actually used were the Zero P screws. Each of these screws cost around $120, for a total of $1,440. The bill that was submitted for reimbursement, however, incorrectly listed eight 14mm Cancellous Polyaxial screws and four 16mm Cancellous Polyaxial screws. These 12 screws each cost $750, for a total of $9,000. The resulting amount overbilled was $7,560. On or around May 24, 2017, when Relator reviewed the package slip which came with restock of the Polyaxial screws, he wrote to SR1 and pointed out what he thought at the time was a mistake; SR1 texted him: "*Don't worry about it. Don't make a big deal.*" The order number for the restock was 54781346 SO. The sale of these screws is also recorded in a Territory Invoice Product Detail of May 25, 2017, which is a rolling database of devices purchased in the DePuy Northeastern Region. The report records the relevant invoice number to be 11279496.

49.   The same Territory Invoice Product Detail of May 25, 2017, contains a number of fraudulent entries because the items billed were not actually used. As the following examples show, some invoices contain more than one inaccuracy:

(i)   Entry with invoice number 11268194 for a surgery: five strips of ChronOS Beta-TCP for a total cost of $7,667. Relator has never seen more than a single vial of ChronOS used in any surgery. The billing of 5 such vials appears to be overbilling;

(ii)   Entry with invoice number 11268193 for a surgery: 2 vials of Confidence Spinal Cement. Relator has never seen more than a single vial used in any surgery. The billing of 2 such vials, totaling $8000, appears to be overbilling; as does the billing for two 15 cm Jamshidi needles at a cost of $236. Relator knows that, with very few exceptions, the surgeons had stopped using such needles more than a year earlier;

(iii)   Entry with invoice number 1129720 for a surgery: four 15 cm needles at a cost of $473. Similarly, Relator knows that the surgeons had stopped using such needles more than a year earlier;

(iv)   Entry with invoice number 11224141 for a surgery: four vials of ChronOS for a total cost of $6,134. Again, Relator has never seen more than a single

vial of ChronOS used in any surgery. The billing of 4 such vials appears to be overbilling; and

50.      The Territory Invoice Product Detail also contains a number of entries

appear fraudulent because the items billed were multi-use tools and should not have

been billed at all, including:

(i)     Entry with invoice number 11234158 for a surgery includes a Cougar 15 DEG TRIAL 10mm, this device was improperly billed at $1,815; a Cougar 15 DEG TRIAL 12mm, this device was improperly billed at $1,815; and a Cougar 15 DEG TRIAL 14mm, this device was improperly billed at $1,815 for a total of $5,445; and

(ii)    Entry with invoice number 11238186 for surgery includes a Viper2 5mm self-drilling Tap improperly billed at $380.

51.      A second Territory Invoice Product Detail also contains a number of

fraudulent entries because the items billed were not actually used. Some invoices

contain more than one inaccuracy:

(i)     Entry with invoice number 11208322: three vials of ChronOS for a total cost of $5,671. Relator has never seen more than a single vial of ChronOS used in any surgery. The billing of 4 such vials appears to be overbilling;

(ii)    Entry with invoice number 11208990: four strips of ChronOS Beta-TCP for a total cost of $7,561. Relator has never seen more than a single strip of ChronOS used in any surgery. The billing of 4 such strips appears to be overbilling;

(iii)   Entry with invoice number 11212759: three strips of ChronOS Beta-TCP for a total cost of $4,600. Relator has never seen more than a single strip of ChronOS used in any surgery. The billing of 3 such strips appears to be overbilling;

(iv)    Entry with invoice number 11214767: two strips of ChronOS for a total cost of $3,067. Relator has never seen more than a single strip of ChronOS used in any surgery. The billing of two such strips appears to be overbilling;

(v)     Entry with invoice number 11213187: two Cortical fix extension screws 50mm for $2900; and two Cortical fix extension screws 45mm for $2,900 for

**Delaney**Kester LLP

a total of $5,800. Relator has seen these screws used just once and believes that they are not ordinarily available at the hospital;

(vi)   Entry with invoice number 11213188: four Cortical fix extension screws 50mm for $5,800. Relator has seen these screws used just once and believes that they are not ordinarily available at the hospital;

(vii)   Entry with invoice number 11213618: five Cortical fix extension screws 50mm for $7,250. Relator has seen these screws used just once and believes that they are not ordinarily available at the hospital.

52.   The second Territory Invoice Product Detail also contains a number of fraudulent entries because the items billed were multi-use tools and should not have been billed at all:

(i)   Entry with invoice number 11213586: Cougar 15 DEG TRIAL 10mm, this device was improperly billed at $1,815; and Cougar 15 DEG TRIAL 12mm, this device was improperly billed at $1,815; and Cougar 15 DEG TRIAL 14mm, this device was improperly billed at $1815 for a total of $5,445;

(ii)   Entry with invoice number 11213618: Cougar LS 18x12 15 DEG TRIAL, this device was improperly billed at $710;

(iii)   Entry with invoice number 11216350: Cougar 15 DEG TRIAL 12mm, this device was improperly billed at $1,815;

(iv)   Entry with invoice number 11218520: Cougar 15 DEG TRIAL 10mm, this device was improperly billed at $1,815; and two Cougar 15 DEG TRIAL 12mm, these devices were improperly billed at $3630; and Cougar 15 DEG TRIAL 14mm, this device was improperly billed at $1815 for a total of $7,260;

(v)   Entry with invoice number 11218864: Cougar LS 18x12 15 DEG TRIAL, this device was improperly billed at $710;

(vi)   Entry with invoice number 11219062: VIPER 2 5mm self-drilling tap, this device was improperly billed at $380;

(vii)   Entry with invoice number 11212893: Cougar LS 18x16 15 DEG TRIAL, this device was improperly billed at $710;

(viii)   Entry with invoice number 11212894: two Cougar LS 18x12 15 DEG TRIAL, these devices were improperly billed at $1420; and two Cougar LS

Delaney**Kester** LLP

18x14 15 DEG TRIAL, these devices were improperly billed at $1,420, for a total of $2,840;

(ix)     Entry with invoice number 11212895: Cougar LS 18x12 15 DEG TRIAL, this device was improperly billed at $710;

(x)      Entry with invoice number 11212896: Cougar LS 18x12 15 DEG TRIAL, this device was improperly billed at $710;

(xi)     Entry with invoice number 11211469: two VIPER 2 5mm self-drilling taps, these devices were improperly billed at $759; two VIPER 2 6mm self-drilling taps, these devices were improperly billed at $759 for a total of $1,518;

(xii)    Entry with invoice number 11211818: Cougar 15 DEG 18x10 TRIAL, this device was improperly billed at $710; Cougar 15 DEG 18x12 TRIAL, this device was improperly billed at $710; Cougar 15 DEG 18x14 TRIAL, this device was improperly billed at $710; for a total of $2,130;

(xiii)   Entry with invoice number 11212893: Cougar LS 18x16 15 DEG TRIAL, this device was improperly billed at $710;

(xiv)    Entry with invoice number 11212894: two Cougar LS 18x12 15 DEG TRIAL, these devices were improperly billed at $1420; and two Cougar LS 18x14 15 DEG TRIAL, these devices were improperly billed at $1,420, for a total of $2,840;

(xv)     Entry with invoice number 11212895: Cougar LS 18x12 15 DEG TRIAL, this device was improperly billed at $710;

(xvi)    Entry with invoice number 11212896: Cougar LS 18x12 15 DEG TRIAL, this device was improperly billed at $710; and

(xvii)   Entry with invoice number 11213586: Cougar 15 DEG TRIAL 10mm, this device was improperly billed at $1815; and Cougar 15 DEG TRIAL 12mm, this device was improperly billed at $1815; and Cougar 15 DEG TRIAL 14mm, this device was improperly billed at $1,815 for a total of $5,445.

53.      Other similar frauds are evident from the pack lists that accompany the restock devices which are intended to replace those used in surgery. As stated above, Relator observed that the restock materials were often different and more expensive

DelaneyKester LLP

than those actually used, and also that many included replacement multi-use devices
indicating improper billing, for example:

(i) Pack List for order number 0114703502 evidences that several items were
originally improperly billed: 2 Mountaineer H/H X-Conn 35 mm plates; 2
Mountaineer H/H X-Conn 45 mm plates; and 2 12mm Fixed Drills. Relator
has never seen so many plates used in a surgery and drills are multi-use
tools that should never have been billed at all;

(ii) Pack List for order number 11212759 evidences that items were originally
improperly billed: 3 ChronOS strips which is far more than necessary to
pack the two implants (one 6 mm and one 7mm) which are also listed in
that order;

(iii) Pack List for order number 0114889854 evidences that two items were
originally improperly billed: two Fixed Drills (one 12mm and one 14mm).
Drills are multi-use tools that should never have been billed at all;

(iv) Pack List for order number 0114487423 evidences that several items were
originally improperly billed: in this case, the system used was a DePuy
trauma system but instead the company billed for items from the
Mountaineer system;

(v) Pack List for order number 0114965267 evidences that several items were
originally improperly billed: four 11G 15 cm needles (when only one would
have been used); four Viper 2 1.45 guidewires (when only one would have
been used); two Cortical Fix Extension 6x40mm screws; and two Cortical
Fix Extension 6=7x40mm screws; and

(vi) Pack List for order number 54666399 evidences that several items were
originally improperly billed: four vials of ChronOS bone filler when only
one would have been used.

54.     In addition to these specific examples, Drs. #1 and #3 changed their

technique in approximately 2016. Prior to the change in technique, Drs. #1 and #3

would use three items: a Jamshidi; a guidewire; and a tap. But the doctors started using

a single awl in place of all three items, nevertheless Defendants continued to bill for the

three items which were no longer used in these surgeries.

**Delaney**Kester LLP

<u>**KICKBACKS**</u>

55.     A central component of Defendants strategy has been to target Dr. #1 with kickbacks, knowing his influence and ability to drive sales within H1.

56.     Defendants have targeted Dr. #1 with significant payments intended to influence, and which have actually influenced, his choice of the surgical implants systems, equipment, and surgical tools used for each surgery at H1.

57.     Some of these payments are disclosed as a result of recent disclosure laws. For example, in 2016 alone, Defendants report payments to Dr. #1 of $68,358.37, which according to CMS is $65,195.16 above the national mean and $49,856.16 above specialty mean. Defendants' payments for 2016 represented more than 99% of the payments received by Dr. #1, as the following CMS chart illustrates:



58.     Defendants' payments to Dr. #1 in 2015 were even larger. In that year alone, Defendants paid Dr. #1 in excess of $130,000, which was $128,986.39 above the national mean and $116,656.50 above the specialty mean. These payments also constituted 99.7% of Dr. #1 total reported payments for that year, as the following chart illustrates:

Delaney Kester LLP

Top Companies Making General Payments



59.     Dr. #1's reported payments from Defendants for 2014 exceeded $110,000.

60.     Dr. #1's reported payments from Defendants for 2013 exceeded $200,000.

61.     The information above only relates to the payments that are reported (or are selectively self-reported[2]). Defendants have also purchased Dr. #1's loyalty through a scheme to provide Dr. #1 reported payments with millions of dollars of unreported kickbacks.

62.     Several times a year, Dr. #1 travels to foreign countries in order to perform surgeries. Apparently, Dr. #1 performs these surgeries purely for personal financial gain.

63.     Prior to each trip, and about once a quarter, Defendants stock and furnish Dr. #1 with surgical bags filled with surgical tools, supplies, and implants. The total value of each fully stocked set of bags is about anywhere from $250,000 to $500,000.

---

[2] For example, Dr. #1's self-reports of payments routinely fail to disclose his significant payments from DePuy in published medical articles concerning cervical spinal surgery, for which DePuy payments would have been relevant and were indeed disclosed by other authors who received similar payments.

DelaneyKester LLP

Defendants stock the bags with their own products free of charge. The supplies are sufficient to perform multiple cases of the most common types of spinal surgeries.

64.     Defendants' employees, typically Relator and SR1, were responsible for stocking the bags to Dr. #1's specifications. To accomplish this goal, Defendants' employees would receive an inventory of items to be placed in the bags. The inventory was extensive, spanning more than one page. The following is an example of one these inventories:

| Description | Quantity | |
| --- | --- | --- |
| Silver clamps | | 3 |
| Angled inserter | | 1 |
| Green handle box curette | | 1 |
| Grey bone tamp | | 1 |
| Brad | | 2 |
| Black curette | | 1 |
| Green cobb | | 1 |
| Down going curette | | 1 |
| Elephant foot | | 1 |
| 1/4 inch osteotome | | 1 |
| Black handle cobb | | 1 |
| Black angled l5-S1 trials | (10-16) | 5 |
| Green angled curette | | 1 |
| Gold tip gear shift | | 1 |
| Pedi gear shift | | 1 |
| Taps many | | 1 |
| Slap hammer 1 | | 1 |
| **Expedium reduction** | | **1** |
| Mallet | | 1 |
| T handles for trial/spreaders | | 2 |
| Angie | | 1 |
| **Black handle reduction** | | **1** |
| 4mm pituitary | | 2 |
| 6mm pituitary | | 1 |
| Green handles for screw drivers | 1 t handle +1 ball handle | |

Delaney**Kester**LLP

| Description | Quantity |
|---|---|
| Black rod holder | 1 |
| Green rod holder | 1 |
| Right angle clamp | 2 |
| Long kelly | 2 |
| Rod hook | 1 |
| Long knife handle | 1 |
| Lateral cages | 4 bags |
| Blue bi polar | 2 |
| Black sanction | 1 |
| Expedium pelvic driver | 1 |
| T20 | 1 |
| Wrench | 2 |
| **Reduction silver bullet** | **3** |
| **Reduction threads** | **3** |
| **Reduction driver** | **3** |
| Atp L5-S1 ? | 3 |
| Spreaders 6-16 | 1 |
| Ap trials 6-16 | 1 |
| Closed extensions | 4 |
| Open extension | 1 |
| Bi polar cords | 9 |
| **300mm Ti rods** | **2** |
| **300mm Cocr rods** | **2** |
| Pelvic connectors | 3 |
| Hyper lordotic implants | 6 |
| **Viper 7x50 screw** | **10** |
| Spine Awl | 1 |
| Green Ring curette | 1 |
| Synframe guide rod 3 | 3 |
| Synframe ring | 1 ring +2 adjust ext |
| Synframe retractor blade 200 | 1 |
| Cervical plates 5 levels | 90mm-1, 95 -2 |
| Cervical plates 4 levels | 88mm-1 |

<u>Medtronic Midas</u>

| | |
|---|---|
| 14ba40 | 4 |
| 14ba50 | 6 |

DelaneyKester LLP

|  | **Description** | **Quantity** |
|---|---|---|
| Mc254 |  | 2 |
| Mc30 |  | 6 |

| Cages bag1 | Cages bag3 |
|---|---|
| 14x50 -2 | 10x50-1 |
| 12x50 - 1 | 14x50-2 |
| 14x45 - 2 | 14x45-1 |
| 12x45 - 1 | 12x45-2 |
| 10x40 - 1 | 10x40-1 |
| 12x40 - 1 | 12x40-1 |
| **Cages Bag2** | **Cages bag4** |
| 12x55-1 | 14x50-2 |
| 14x50-2 | 14x45-1 |
| 14x45-2 | 12x50-1 |
| 12x45-2 | 12x45-2 |
| 14x40-1 | 12x40-2 |
| 12x40-1 |  |

65.     These substantial, recurring payments have influenced and continue to influence Dr. #1's surgical procedures.

66.     Relator is also aware that Defendants have been using corporate entertainment as a kickback to induce doctors to purchase DePuy products. In one text exchange which included SR1, SR2, Sales Representative 4 ("SR3") and Sales Representative 4 ("SR4"), SR1 wrote "*Just wanted to let everyone know that [SR3] needs us to deliver 950 this month. I am pretty sure we can Deliver 600 but we need 350 elsewhere. Also lets get dinner on the books with the following. [SR3] wants to come and help us grow the business.*" SR1 then lists the names of target doctors and concludes "*We really need a lot of momentum going into January. In January we will need to deliver 1 million a month to meet quota. We need to open the books back up at [H3] and [H4].*"

Delaney Kester LLP

67.     Employees of Defendants, including SR1, have also given gifts worth in excess of $5,000 to H1.

### DEFENDANTS' RETALIATION AGAINST RELATOR

68.     Relator began working for the Defendants in May 2015. His initial title was Clinical Specialist. He was later promoted to Junior Sales Representative. Initially Relator received a salary with no commissions or bonuses for overcalled sates.

69.     At all times material hereto, Relator's immediate supervisor was SR1.

70.     At all times material hereto, SR1's immediate supervisor was SR3.

71.     Through a third party, Relator was credentialed to be able to enter H1 and move about freely in the hospital. There was no area off limits to Relator and he was routinely in the operating room with patients while surgery was taking place.

72.     Through a third party, Relator was credentialed to be able to enter H1 and move about freely in the hospital. There was no area off limits to Relator and he was routinely in the operating room with patients while surgery was taking place.

73.     In October 2016, Relator grew concerned about safety problems at H1 that were being caused by Defendants. Specifically, H1 was using supplies and instruments that were not sterile and were not being properly sterilized, if at all. Relator reported these concerns internally but notwithstanding the real danger to patients' lives, Defendants did nothing.

74.     Maintaining sterility is a vital component of surgery. Failure to maintain to sterility undermines the purpose of surgical intervention. For this reason, there are express and implied certifications that sterility is maintained throughout surgical

Delaney**Kester**LLP

procedures paid for by Government Health Care Programs. The failure to maintain sterility is material to the Government Health Care Programs, and if the Government Health Care Programs learn that a facility does not maintain proper sterility, they will take various remedial actions, including surprise inspections, refusing to pay claims, mandatory corrective action plans, and program exclusion.

75.     Relator also grew concerned about improper, false, and fraudulent billing practices at H1. Specifically, as set forth above, Relator learned that Defendants made false and fraudulent statements as to the products and quantities used on reports that are filled out by the Defendants' sales representatives. These reports were then submitted to H1 and the information on the reports was entered verbatim into the billing software.

76.     Government Health Care Programs require accurate reporting of financial information on cost reports and credit balances. Health care providers are precluded from knowingly filing, or causing to be filed, improper claims for reimbursement. This includes the presentation of claims that inflate the value of the items or services provided, or which claim that items or services were provided when they weren't.

77.     In the case of H1, the false and fraudulent billing caused financial harm to the Government Health Care Programs in a variety of ways. First, to the extent that Medicare and Medicaid received and paid inflated claims, there was financial injury to those programs. Second, to the extent that Medicare and Medicaid reimbursement was fixed, the Massachusetts Health Safety Net received and paid inflated claims, thereby depleting the available funds in the program and causing financial injury. Third, the

**Delaney**Kester LLP

inflated costs were reported to Medicare as genuine utilization and hospital-specific charges for H1, thus affecting Medicare's calculation of appropriate reimbursement for future surgeries of that type.

78.     In May 2017, Relator took his concerns about safety issues and overbilling to the government. Two days after meeting with the government, Relator's boss SR1 was interviewed by law enforcement officials, and thus he became aware of the Relator's allegations and protected conduct.

79.     On becoming aware of Relator's allegations, H1 immediately banned SR1 from the hospital. Officials at H1 also summoned Relator to their offices and demanded information, threatening him that if he did not cooperate he too would be banned from the hospital.

80.     A few days later, SR3 was found dead of a suspected drug overdose. He was 47-years old.

81.     By May 2017, Relator was supposed to begin earning a percentage of overall sales, which he had been promised when he started his employment. However, in a conversation with senior manager shortly after Relator had brought his concerns to the government, this offer was effectively revoked.

82.     Later in May 2017, an incident occurred at H1 where Relator believed that non-sterilized equipment from the Defendants was going to be used in a surgery that had not yet started. He raised his concerns with officials at H1 and the Defendants. Eventually, the concerns were addressed and Defendants substituted new, sterile

**DelaneyKester** LLP

equipment. However, by now it was clear that Relator was interfering with Defendants' ruthless pursuit of profit.

83.     This incident was very stressful and traumatic to the Relator and caused him significant anxiety and worry.

84.     In late May/early June, Relator felt overwhelmed with safety issues and the overbilling fraud. He began requesting supporting from his superiors and sales colleagues. These requests were ignored.

85.     The stress and anxiety drove the Relator to seek counseling. On June 28, 2017, the stress caused Relator to become disabled and he took a leave for short term disability.

86.     Prior to and after the commencement of the short-term disability, Relator began receiving threats and harassment, primarily from SR1. SR1 would even visit Relator at H1, despite the ban.

87.     Defendants' upper management showed no interest in resolving the safety or billing issues that drove the Relator to alert the government. Indeed, it is a telling omission that the Defendants never contacted the Relator to understand or ask about: (a) his safety and overbilling concerns, (b) the incident in May involving non-sterile equipment, (c) why law enforcement officials had met with SR1 in May, (d) why H1 immediately banned SR1 from the hospital, and (e) why SR3 may have died just days later. Defendants knew that the Relator had been engaged in protected activity and thus made no attempt to learn anything from him about the events.

**Delaney Kester** LLP

88.     Relators' fellow employees acknowledged that Relator was being retaliated against, expressing their sympathy for him being "thrown to the wolves."

89.     In late July 2017, Defendants demanded Relator return his smartphone and iPad. Officials rebuffed Relator's concerns that he had personal photographs stored on the devices and demanded they be permitted to inspect his devices to see who he had been contacting.

90.     On January 30, 2018, Defendants wrote to Relator informing him for the first time that he his employment had been terminated.

## DAMAGES

91.     When a kickback has been paid, one measure of damages is the full amount of the claim caused by the kickback—such as the amounts billed to Medicare for a kickback-tainted medical device and the related medical procedure using that device.

92.     All such kickback-tainted payments are owed back to the government. Medicare and other Government Health Care Programs have paid claims for medical devices and related medical procedures that were tainted by Defendants knowingly having paid kickbacks.

93.     Specifically, Defendants have provided Dr.#1 with millions of dollars of kickbacks, including hundreds of thousands of dollars in free surgical supplies that he received on a quarterly basis to take out of the country for surgeries that he performed for his own personal profit. These transfers ensured that Dr.#1 would continue to recommend and use Defendants products at H1, thus tainting the reimbursement for all surgeries performed at H1 and all reimbursement received from Government Health

DelaneyKester LLP

Care Programs. Relator estimates that the total cost of all tainted claims may run into the millions per annum.

94.     In addition, Relator believes that the type of overbilling described in this complaint has been going on for the entire tenure of SR1 (ten years or so). The most common example of this fraud is likely the use of inexpensive regular, screws but the billing of the more expensive Cortical fix screws. The billing for multi-use items which should not have been billed appears to have been an intermittent phenomenon before it became a regular practice after March 2016.

95.     SR1's territory also covers Hospitals 1 through 5 and Relator believes that similar overbillings are also taking place at those locations. Indeed, the incentive compensation structure which governs SR1's pay encourages the overbilling of these devices because SR1 receives 4 percent of the entire bill. In these circumstances, it is conceivable if not likely, that similar overbilling is a nationwide phenomenon.

96.     As stated, the ordering of items other than the ones actually used during surgery creates two tell-tale effects: first, there is a dearth of the items which were actually used creating the need for *ad hoc* ordering which should be unnecessary in a closed loop system; second, it creates a surplus of the items that are ordered because they are not needed. Relator recalls having to make special requests for items which were missing and observed a stockpile of hundreds of guidewires, taps and jamshidi needles.

**Delaney Kester** LLP

97.     The use of screws other than those billed also creates a telltale sign: the profile of the screws can be verified by reference to the lateral x-ray which is included in each patient file.

98.     It is evident from the Territory Invoice Product Detail reports which only cover a few weeks, that the fraudulent billing rate is high and that many invoices contain multiple falsities. Relator estimates that annual overbillings may run into the millions per annum.

99.     It is evident from the Territory Invoice Product Detail reports which only cover a few weeks, that the fraudulent billing rate is high and that many invoices contain multiple falsities. Relator estimates that annual overbillings may run into the millions per annum.

## LEGAL CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
Federal False Claims Act
31 U.S.C. §3729(a)(1)(A)

100.    Relator restates and re-alleges the allegations contained in paragraphs 1–99 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

101.    The Defendants knowingly presented and caused to be presented false or fraudulent claims to the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1).

102.    The United States paid said claims and has sustained damages because of these acts by the Defendants. Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1),

Delaney Kester LLP

the United States is entitled to three times the amount of actual damages plus the maximum penalty of $21,562.80 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## SECOND CAUSE OF ACTION
Federal False Claims Act
31 U.S.C. §3729 (a)(1)(B)

103.    Relator restates and re-alleges the allegations contained in paragraphs 1–102 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

104.    The Defendants knowingly made, used or caused to be made or used false statements to get false or fraudulent claims paid by Government Health Care Programs, and the United States, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2).

105.    The United States paid said claims and has sustained damages because of these acts by the Defendant. Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), the United States is entitled to three times the amount of actual damages plus the maximum penalty of $21,562.80 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## THIRD CAUSE OF ACTION
Federal False Claims Act/Illegal Kickbacks
31 U.S.C. § 3729, *et seq.*

106.    Relator repeats and realleges all of the allegations set forth in paragraphs 1– 105 as if set forth fully herein.

**Delaney Kester** LLP

107.     This is a claim for treble damages and penalties against Defendants under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

108.     As described above, Defendants offered and/or provided unlawful financial inducements to Dr. #1 and other physicians at H1 in violation of the AKS, 42 U.S.C. § 1320a-7b(b). Such financial inducements took the form of unlawfully-subsidized cash payments and free goods for personal use. Defendants thereby paid their Government Health Care Program customers millions of dollars to purchase DePuy products. Consequently, those payments and gifts were unlawful "kickbacks" paid to physicians to induce them to purchase or recommend DePuy products.

109.     Furthermore, and as described above, Defendants paid kickbacks to Dr. #1 and other physicians at H1 to schedule surgeries using DePuy products. Such kickbacks included, without limitation, entertainment costs, speaking and consulting fees, royalty payments, free goods for personal use, and cash honoraria.

110.     By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States, in violation of federal law.

111.     By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to induce the United States to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of federal law.

112.     The United States – unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by

**Delaney Kester** LLP

Defendants – paid and continues to pay claims that would not be paid but for Defendants' conduct as alleged herein.

113.   By reason of Defendants' conduct, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

114.   Pursuant to federal law, the United States is entitled to three times the amount of actual damages; plus the maximum penalty of $21,563, for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendants after November 2, 2015, as alleged herein.

115.   In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. And, as provided by federal law, Relator is entitled to a "relator's share" of any recovery obtained by the United States as a result of this claim.

**FOURTH CAUSE OF ACTION**
Massachusetts False Claims Law
Mass. Gen. Laws Ch. 12 §§ 5B(1)

116.   Relator restates and re-alleges the allegations contained in paragraphs 1–115 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

117.   The Defendants knowingly presented and caused to be presented false and fraudulent claims to Government Health Care Programs and the Commonwealth of Massachusetts, all in violation of the Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(1).

**Delaney Kester** LLP

118.     The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

119.     Pursuant to M.G.L. Ch. 12 § 5B(9), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**FIFTH CAUSE OF ACTION**
Massachusetts False Claims Law
Mass. Gen. Laws Ch. 12 §§ 5A *et seq.*

120.     Relator restates and re-alleges the allegations contained in paragraphs 1–119 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

121.     The Defendants knowingly made, used and caused to be made, and used false statements to get false and fraudulent claims paid by Government Health Care Programs and the Commonwealth of Massachusetts, all in violation of the Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(2).

122.     The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

123.     Pursuant to M.G.L. Ch. 12 § 5B(9), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

Delaney**Kester**LLP

## SIXTH CAUSE OF ACTION
FCA Retaliation
31 U.S.C. §3730(h)

124.     Relator repeats and realleges each of the allegations set forth in paragraphs 1–123 as if fully set forth herein.

125.     As set forth in detail above, Defendants threatened, harassed and otherwise discriminated against Relator Doe because of his lawful acts involving a potential violation(s) of the False Claims Act by his employer, the Defendants. By these actions, Defendants violated the False Claims Act, 31 U.S.C. § 3730(h).

126.     Defendants retaliated against Relator Doe, and ultimately fired him, because he refused to engage in practices that led to the presentation of false claims to the United States. Any other ground for dismissing or disciplining Relator Doe was pretextual. Accordingly, Defendants discharged, harassed, and discriminated against Relator Doe on account of conduct protected by 31 U.S.C. § 3130(h). Such conduct constitutes retaliatory conduct in violation of said statute.

127.     Relator Doe has been damaged as a direct result of these illegal actions. He has suffered economic harm, loss of income and future earnings, and emotional injury.

## SEVENTH CAUSE OF ACTION
Massachusetts FCA Retaliation
M.G.L. Ch. 12 § 5J

128.     Relator Doe repeats and realleges each of the allegations set forth in paragraphs 1–127 as if fully set forth herein.

129.     As set forth in detail above, Defendants threatened, harassed and otherwise discriminated against Relator Doe because of his lawful acts involving a potential

Delaney**Kester**LLP

violation(s) of the False Claims Act by her employer, Defendants. By these actions, Defendants violated the Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12 § 5J.

130.     Defendants retaliated against Relator Doe, and ultimately fired him, because he refused to engage in practices that led to the presentation of false claims to the United States. Any other ground for dismissing or disciplining Relator Doe was pretextual. Accordingly, Defendants discharged, harassed, and discriminated against Relator Doe on account of conduct protected by M.G.L. Ch. 12 § 5J. Such conduct constitutes retaliatory conduct in violation of said statute.

131.     Relator Doe has been damaged as a direct result of these illegal actions. He has suffered economic harm, loss of income and future earnings, and emotional injury.

## EIGHTH CAUSE OF ACTION
Wrongful Termination in Violation of Public Policy

132.     Relator Doe repeats and realleges the allegations set forth paragraphs 1–131 as if fully set forth herein.

133.     Defendants has wrongfully terminated Relator Doe 's employment in retaliation for engaging in activity required by the law and/or for refusing to what the law forbids all in violation of public policy.

134.     Defendants 's conduct has caused damage to Relator Doe in the form of, inter alia, lost salary, lost benefits and emotional distress.

## NINTH CAUSE OF ACTION
Retaliatory Actions against Health Care Providers
M.G.L. Ch. 149 § 187

135.     Relator Doe repeats and realleges the allegations set forth in paragraphs 1–134 as if fully set forth herein.

**Delaney**Kester LLP

136.     Medical device sales representatives such as the Relator play a critical role in the modern Operating Room. Their extensive knowledge of the devices they sell allows them to consult with surgeons and provide clinical benefit. Medical sales device work alongside nurses, scrub techs, and circulators, setting up product trays with hundreds of instruments to deliver to the operating room before the procedure.

137.     While surgeons are experts in their medical field, the medical device sales representatives are experts on the surgical products that surgeons increasingly rely on to deliver high-quality care. The experience and specialized knowledge of medical device sales representatives makes surgeries safer and more efficient for patients. Indeed, in many operating rooms, medical device sales representatives act as an extra safety net in the operating room in case there is a complication or problem with the device or implant.

138.     As a medical device sales representative for H1's primary supplier of surgical supplies, Relator falls within the definition of a health care provider for purposes of M.G.L. Ch. 149 § 187.

139.     Relator disclosed to Defendants' manager and to a public body the activity, policy, or practice of failing to sterilize surgical equipment and tools, which Relator reasonably believed was in violation of a law or rule or regulation promulgated pursuant to law or reasonably believed that reporting the activity was an emergency because the lives of patients were at stake.

140.     Defendants have taken retaliatory action against Relator Doe in violation of M.G.L. Ch. 149 § 185(b).

**Delaney Kester** LLP

141.    Defendants' conduct has caused damage to Relator Doe in the form of, inter alia, lost salary, lost benefits and emotional distress.

## TENTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing

142.    Relator Doe repeats and realleges the allegations set forth in paragraphs 1–141 as if fully set forth herein.

143.    Every contract contains an implied term of good faith and fair dealing between the parties.

144.    Relator Doe reported what he reasonably believed to be unlawful activity to his supervisor at Defendants. In response Defendants retaliated against Relator Doe for reporting such activity and thereby breached the implied term of good faith and fair dealing.

145.    Defendants' conduct has caused damage to Relator Doe in the form of, inter alia, lost salary, lost benefits and emotional distress.

## ELEVENTH CAUSE OF ACTION
### Breach of Contract

146.    Relator Doe repeats and realleges the allegations contained in paragraphs 1–145.

147.    Defendants and Relator Doe are parties to a contract entitled the "Stock Option and Incentive Plan" (the "Plan"). Under the terms of the Plan, Relator Doe 's outstanding stock options should have become fully exercisable. Defendants prevented Relator Doe from exercising his rights under the Plan and so breached the contract between them.

**Delaney**Kester LLP

148.     As a result of Defendants 's breach, Relator Doe has suffered monetary damages.

WHEREFORE, Relator, on behalf of the United States of America and the Commonwealth of Massachusetts, requests that this Court:

(a)   Enter judgment holding Defendants liable for civil penalties of $21,562.80 for each violation of the False Claims Act;

(b)   Enter judgment holding Defendants liable for civil penalties of $10,000 for each violation of the Massachusetts False Claims Act;

(c)   Enter a judgment against Defendants for three times the amount of damages sustained by the United States because of their acts;

(d)   Enter a judgment against Defendants for three times the amount of damages sustained by the Commonwealth of Massachusetts because of their acts;

(e)   Award the Relator the maximum percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730 and M.G.L. Ch. 12 § 5F.

(f)   Award the Relator his costs and reasonable attorney's fees for prosecuting this action;

(g)   With respect to the 31 U.S.C. § 3730(h) and M.G.L. Ch. 12 § 5J, enter judgment against Defendants awarding Relator Doe all available damages and relief against Defendants including, without limitation, two times the amount of back pay he would have earned but for the retaliation, with interest on that award; reinstatement with full fringe

**Delaney Kester** LLP

benefits and seniority rights; compensation for all special damages he

sustained as a result of Defendants' harassment and termination; and

costs and reasonable attorneys' fees for prosecuting his retaliation

claims;

(h)   Enter judgment against Defendants awarding Relator all contractual

damages;

(i)   Enter judgment against Defendants awarding Relator damages for

emotional distress;

(j)   Enter judgment against Defendants compensating Relator Doe for lost

wages, benefits and other remuneration, and interest thereon; and

(k)   Order Defendants to pay Relator's reasonable litigation costs, reasonable

expert witness fees and reasonable attorneys' fees; and

(l)   Enter such other relief which the Court finds just and equitable.

**PLAINTIFFS DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Respectfully submitted

Dated: March 28, 2018

Royston H. Delaney, Esq. (BBO655666 )
Ilyas J. Rona, Esq. (BBO642964)
DELANEY KESTER LLP
50 Congress Street, Suite 600
Boston, Massachusetts 02109
(857) 498-0384
royston@delaneykester.com
ilyas@delaneykester.com

*-and-*

Delaney Kester LLP

Charles F. Kester, Esq.
DELANEY KESTER LLP
4505 Las Virgenes Road, Suite 203
Calabasas, California 91302
(818) 974-8627
charles@delaneykester.com

*Attorneys for the Relator*