# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ALEKSEJ GUSAKOVS,** | ) |
| **Plaintiff,** | ) |
| **v.** | )    **Case No. 17-cv-11502-DJC** |
| **JOHNSON & JOHNSON and DEPUY SYNTHES SALES, INC.,** | ) |
| **Defendants.** | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                    **June 16, 2023**

## I.    Introduction

Plaintiff Aleksej Gusakovs ("Gusakovs")[1] has filed this lawsuit relating to alleged federal and Massachusetts False Claim Act ("FCA") retaliation against him by Defendants Johnson & Johnson ("J&J") and DePuy Synthes Sales, Inc. ("DePuy Synthes Sales") (collectively, "Defendants").[2]  D. 2; D. 13; D. 91-1.  Pending before the Court is Gusakovs' motion to amend for leave to file a proposed second amended complaint ("PSAC"), D. 91, Defendants' motion to dismiss the first amended complaint ("FAC"), D. 13, or, in the alternative, to strike certain allegations, D. 96, and Defendants' motion to dismiss the PSAC or, in the alternative, to strike

---

[1] Gusakovs originally brought this suit as Plaintiff-Relator John Doe on behalf of the United States of America and the Commonwealth of Massachusetts (collectively, the "Government").  D. 2; D. 13; D. 91-1 ¶ 1.

[2] DePuy Synthes, Inc. was originally also named as a defendant, D. 2 ¶ 7; D. 13 ¶ 7, but Gusakovs voluntarily dismissed all claims against it, D. 89.

certain allegations, D. 99.  For the reasons stated below, the Court ALLOWS Gusakovs' motion to amend for leave to file the PSAC, D. 91; DENIES as moot Defendants' motion to dismiss the FAC, D. 96; DENIES Defendants' motion to dismiss the PSAC as to Count I for federal FCA retaliation, Count II for Massachusetts FCA ("MFCA") retaliation, and Count III for wrongful termination in violation of public policy, insofar as it relates to sterilization incidents and the reporting of same, and ALLOWS it as to all remaining claims, D. 99; and DENIES in part Defendants' motion to strike allegations in the PSAC regarding kickbacks, and ALLOWS it in part as to allegations regarding the death of Erik Knaus, id.

## II.    Standard of Review

### A.    <u>Motion to Dismiss</u>

A defendant may move to dismiss for a plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To withstand a Rule 12(b)(6) challenge, the Court must determine if the complaint "plausibly narrate[s] a claim for relief."  <u>Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013) (citations omitted).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  <u>Id.</u> (citation omitted).  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  <u>Id.</u> (citation omitted).  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  <u>Haley v. City of Boston</u>, 657 F.3d 39, 46 (1st Cir. 2011) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  <u>García-Catalán</u>, 734 F.3d at 103 (quoting <u>Iqbal</u>, 556 U.S. at 678).

B.      **Motion to Amend**

Rule 15(a) "mandates that leave to amend is to be 'freely given when justice so requires' .

. . unless the amendment 'would be futile, or reward, *inter alia*, undue or intended delay.'" Steir

v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) (quoting Fed. R. Civ. P. 15(a)(2) and

Resol. Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994)).  Rule 15(a)'s "liberal amendment

policy . . . does not mean that leave will be granted in all cases." Acosta-Mestre v. Hilton Int'l of

P.R., Inc., 156 F.3d 49, 51 (1st Cir. 1998) (quoting 6 Charles Alan Wright, Arthur R. Miller &

Mary Kay Kane, Federal Practice and Procedure § 1487, at 611 (2d ed. 1990)) (internal quotation

marks omitted).  That is, a court acts within its discretion to deny a motion for leave to amend

under Rule 15(a)(2) when the proposed amendment would be futile.  See Aponte-Torres v. Univ.

of Puerto Rico, 445 F.3d 50, 58 (1st Cir. 2006).

III.    **Factual Background**

The following facts are drawn from the PSAC, D. 91-1, and are accepted as true for the

purpose of resolving the pending motions.

 Defendants and other DePuy Synthes-related companies are a large conglomerate

manufacturing and marketing spinal implants.  Id. ¶ 13.  On April 8, 2015, Gusakovs received an

"Offer Letter" for employment as a "Clinical Specialist (Spine) in the Boston, MA (East) territory"

from DePuy Synthes Sales, which J&J wholly owns.  Id. ¶¶ 14–15.  The following day, Gusakovs

signed, accepted, and returned the Offer Letter.  Id. ¶ 14.  While DePuy Synthes Sales was his

named employer, Gusakovs believed J&J was his co-employer because, among other things, J&J

wholly owned DePuy Synthes Sales, J&J processed his paychecks and administered his

employment benefits, he was required to sign J&J's policy on business conduct, and he received

correspondence from J&J on J&J letterhead.  Id. ¶ 15.

Gusakovs' main job responsibility was to sell spinal implant and surgical products, primarily to Boston Medical Center ("BMC").  Id. ¶¶ 16–17.  His employment began in May 2015 and he initially received a salary with no commissions or bonuses for overall sales.  Id.  Gusakovs' immediate supervisor was sales representative Matt Capobianco ("Capobianco"), who was the Boston area sales manager for DePuy Synthes Sales, and Capobianco's immediate supervisor was Erik Knaus ("Knaus"), who was the regional sales manager.  Id. ¶ 17.

 Throughout the course of his employment, Gusakovs alleges that he witnessed Defendants' unlawful kickbacks to spinal surgeon Dr. Tony Tannoury ("Tannoury"), knowing that he had the influence and ability to drive sales with BMC.  Id. ¶ 18.  Accordingly, he alleges that Defendants made disclosed and non-disclosed payments to Tannoury with the intent to influence his choice of the surgical implants systems, equipment, and surgical tools used for each surgery he performed at BMC and elsewhere.  Id. ¶¶ 18–22.  In addition to these payments, Gusakovs alleges that he learned during his employment that Defendants would provide Tannoury with surgical bags filled with tools, supplies, and implants to use in surgeries Tannoury performed in foreign countries.  Id. ¶¶ 23–25.  These bags, allegedly valued anywhere between $250,000 and $500,000, were stocked by Defendants' employees, including Gusakovs and Capobianco, and were intended to influence Tannoury's choice of surgical implant systems, equipment, and tools.  Id. ¶¶ 24–26.  Gusakovs alleges that he learned that Defendants used corporate entertainment as a kickback as well, activities which Capobianco and Knaus facilitated.  Id. ¶ 27.

Also during the course of his employment, Gusakovs alleges that he witnessed patient-safety problems at BMC caused by Capobianco.  Id. ¶ 28.  The first incident occurred in September 2016, when Gusakovs was assisting Capobianco with a surgery.  Id.  During the surgery, it was determined that certain universal connectors needed to be sterilized.  Id.  Gusakovs claims that he

saw Capobianco grab some unsterilized connectors, put them in his pocket, and then leave the room.  Id.  Upon his return, Capobianco gave Gusakovs a used sterile bag that contained two universal connectors that Capobianco claimed had been sterilized.  Id.  Gusakovs alleges that he knew the connectors had not been properly sterilized, so he told Capobianco that there was a hole in the bag to prevent the use of unsterilized connectors and any consequent infections.  Id.  The connectors were ultimately not needed for the surgery.  Id.

The second incident occurred in October 2016, when a surgeon determined that six to eight non-cannulated screws were needed, but no such screws had been sterilized.  Id. ¶ 29.  Gusakovs submitted the screws to the BMC department responsible for sterilization, the Central Processing Department ("CPD"), to try to get them sterilized in time.  Id.  When Capobianco learned that he had done this, he allegedly yelled at Gusakovs to withdraw the screws from CPD because they would not be ready in time.  Id.  Capobianco removed the screw heads from other previously sterilized screws.  Id.

On October 29, 2016, Gusakovs called the J&J Corporate Internal Audit Department ("J&J CIAD") to report Capobianco's alleged misconduct.  Id. ¶ 31.  He subsequently spoke with Chan Goan ("Goan") of the J&J CIAD and expressed his concerns about the alleged sterilization incidents with Capobianco.  Id.  Soon thereafter, on November 9, 2016, Goan called Gusakovs to explain that J&J Regulatory Compliance ("J&J RC") would be handling the matter moving forward.  Id.  The next day, November 10, 2016, Susan McInlay ("McInlay") of the J&J RC emailed Gusakovs to inform him that she would be investigating his concerns.  Id.  During the ensuing two months, Gusakovs and McInlay corresponded several times, in which he relayed what had happened during the alleged sterilization incidents and repeatedly asked about the status of the J&J RC's investigation.  Id. ¶¶ 31–34.  On January 23, 2017, McInlay emailed Gusakovs stating

that "[t]he investigation is progressing" and that he would "receive an update once the investigation is complete," but he never received any other correspondence from her again.  Id. ¶ 34.

Over the next five months, Gusakovs continued working with Capobianco.  Id. ¶ 35.  As seven months had passed without Defendants addressing Gusakovs' concerns, he decided to report the alleged kickbacks and sterilization incidents to the Government.  Id. ¶¶ 35–36.  On May 22, 2017, he was interviewed at the U.S. Attorney's Office in Boston, where he detailed Defendants' alleged payments of kickbacks and Capobianco's attempted breaches of BMC's sterility protocols.  Id. ¶ 36.

At the end of May 2017, a third sterilization-related incident occurred at BMC.  Id. ¶ 37.  According to Gusakovs, Capobianco had several universal connectors in his hands and claimed that he was "heading downstairs" to have them sterilized.  Id.  As Gusakovs knew there was not enough time for the connectors to be properly sterilized, he informed BMC's CPD's Sally Njoroge ("Njoroge"), who, along with the CPD director, intervened and prevented the use of the unsterilized connectors.  Id.  As alleged, Capobianco was immediately banned from the hospital and BMC demanded information from Gusakovs about what had transpired.  Id. ¶ 38.

Also at the end of May 2017, the Federal Bureau of Investigations ("FBI") interviewed Capobianco at his home regarding the sterilization incidents.  Id. ¶ 39.  Because Capobianco subsequently informed Gusakovs of the interview, Gusakovs alleges that Capobianco was aware that Gusakovs had spoken to the Government about the alleged unlawful kickbacks and sterilization incidents.  Id.  A few days later, on June 6, 2017, the Boston U.S. Attorney's Office issued a subpoena to J&J, relating to the "processing, cleaning and sterilization of DePuy Spine devices" as well as "remuneration, such as payments, travel, entertainment or gifts, provided to

BMC or health care providers affiliated with BMC" and documents relating to J&J's "compliance with the Anti-Kickback statute." Id. ¶ 41.  In Gusakovs' view, because of the overlap between the subpoena and his prior complaints to the J&J CIAD, "it was obvious to Defendants that [he] had contacted the government and was engaged in 'protected activity' (i.e., whistleblowing) under federal and state law." Id.

Around this time, Gusakovs began to feel overwhelmed at work because of the alleged unlawful kickbacks, sterilization incidents, and an increased workload due to Capobianco's ban from BMC. Id. ¶¶ 42–43.  About a month later, on June 28, 2017, Gusakovs took a short-term disability leave for a disability related to stress. Id. ¶ 45.  In July 2017, Defendants demanded the return of his work phone and iPad so that Defendants could inspect them due to "a government investigation regarding DePuy spinal implants." Id. ¶ 51. Gusakovs' short-term disability leave was extended several times over the ensuing months but ended on December 26, 2017. Id. ¶ 46. Although Gusakovs applied for long-term disability benefits, his application was denied on March 16, 2018 and his appeal was denied on May 31, 2018. Id. ¶ 47.

On January 30, 2018, J&J sent Gusakovs a letter concerning his 2017 year-end W-2 form, which expressed concern about supposedly having advanced taxes on his behalf in 2017 that J&J would be "unable to recover in 2018 due to your termination." Id. ¶ 52.  He had not previously been informed of his termination or the reason why, but he assumed it was because he had "blown the whistle" on Defendants to the Government. Id. ¶¶ 52–53.  On April 19, 2018, J&J sent him another letter, which informed him of his right to COBRA health insurance coverage "[a]s a result of your Termination on April 12, 2018." Id. ¶ 55.  That same day, J&J sent Gusakovs' wife an identical letter, except that it stated:  "As a result of your or your family member's Termination on April 12, 2018." Id.

As a result of these events, Gusakovs alleges that he "has suffered severe emotional trauma causing physical symptoms including, but not limited to, anxiety, panic attacks, depression, increased heart rate, shortness of breath, body shakes, body temperatures changes, night sweats, and insomnia" and has been unable to regain employment in the medical device industry.  Id. ¶¶ 59–60.

## IV.     Procedural History

On August 11, 2017, Gusakovs initiated this lawsuit under seal, as a John Doe relator on behalf of the Government, primarily raising claims against Defendants and DePuy Synthes, Inc. under the FCA and Anti-Kickback statute ("AKS") relating to their alleged unlawful billing practices and kickbacks.  D. 2.  On March 29, 2018, he amended his complaint, asserting eleven claims against Defendants and DePuy Synthes, Inc. in the FAC:  violations of the federal and Massachusetts FCA relating to their alleged unlawful billing practices and kickbacks; FCA retaliation; MFCA relation; wrongful termination in violation of public policy; retaliatory actions against health care providers; breach of the implied covenant of good faith and fair dealing; and breach of contract.  D. 13.

After five years of investigation, on September 6, 2022, the Government intervened against DePuy Synthes, Inc. and DePuy Synthes Sales only as to FAC Count III, which related specifically to the alleged kickbacks to Tannoury.  D. 62 at 1.  The Government declined to intervene with respect to all other counts in the FAC and declined to intervene against J&J.  Id.  On January 13, 2023, Gusakovs, Defendants, DePuy Synthes, Inc., and the Government signed a Settlement Agreement,          Settlement          Agreement,          https://www.justice.gov/opa/press-release/file/1563296/download (last visited June 16, 2023), and notified the Court of same on January 17, 2023, D. 70.

In accordance with the Settlement Agreement, Gusakovs and the Government jointly moved for dismissal of all claims in the FAC, except for the claims arising from Gusakovs' allegations in paragraphs sixty-eight through ninety of the FAC—namely, the allegations related to the alleged employment retaliation against him.  D. 72 at 1; Settlement Agreement at 6, 12. With this carve-out, the Court granted the dismissal of all other claims on January 27, 2023.  D. 73.

Following the dismissal, the Court ordered the parties to confer and file a joint statement proposing a schedule for further proceedings as to Gusakovs' remaining claims.  D. 74.  The parties did not reach a mutually agreeable schedule, in part because they could not agree whether service of the FAC had been properly effectuated and Gusakovs intended to amend his pleading.  D. 80 at 2-3, 4.  In light of the parties' disagreement, the Court ordered Gusakovs to serve the summons and FAC on Defendants and DePuy Synthes, Inc. and to file a motion for leave to file a second amended complaint by March 3, 2023.  D. 84.

On March 3, 2023, Gusakovs filed proof of service, D. 87; D. 88, moved for leave to file the PSAC, D. 91, and voluntarily dismissed DePuy Synthes, Inc. from the lawsuit and voluntarily dismissed the retaliatory actions against health care providers claim from the FAC as to all remaining Defendants, D. 89; D. 90.  The PSAC asserts seven claims against Defendants:  federal FCA retaliation (Count I); MFCA retaliation (Count II); wrongful termination in violation of public policy (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); breach of contract (Count V); intentional infliction of emotional distress (Count VI); and negligent infliction of emotional distress (Count VII).  D. 91-1 at 22-30.  Defendants have opposed the motion for leave to file the PSAC and moved for dismissal of both the FAC and PSAC.  D. 96; D.

98; D. 99.   The Court heard the parties on the pending motions and took the matters under advisement.   D. 104.

## V.    Discussion

### A.    Motion to Amend

Defendants oppose Gusakovs' motion for leave to file the PSAC on the bases of undue delay, prejudice, and futility, D. 98 at 4–20, none of which warrant denial of the motion to amend.

#### 1.    Undue Delay and Prejudice

The First Circuit has repeatedly instructed that "undue delay, on its own, may be enough to justify denying a motion for leave to amend." Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 34 (1st Cir. 2016) (citing cases). "[W]hen considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has [at the very least] the burden of showing some valid reason for his neglect and delay." Pérez v. Hosp. Damas, Inc., 769 F.3d 800, 802 (1st Cir. 2014) (second alteration in original) (citation and internal quotation marks omitted). At the same time, however, "[t]here is no delay that is *per se* undue" and "a district court mulling a motion to amend in a particular case must consider any alleged delay with that case's specific history in mind." Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharm., Inc., 305 F. Supp. 3d 337, 343 (D.R.I. 2018).   "In assessing whether a movant has carried this burden, courts must take into account [w]hat the plaintiff knew or should have known and what he did or should have done." Hagerty, 844 F.3d at 34 (alteration in original) (citation and internal quotation marks omitted).

Here, the original complaint was filed almost six years ago and the FAC was filed over five years ago—considerable amounts of time by any metric.  D. 2; D. 13.  Defendants argue that Gusakovs has not provided sufficient reason to justify the delay, the additional allegations in the

PSAC were all known to him by May 2018, and he was aware of his ability to amend the complaint while under seal. D. 98 at 4–7.

Gusakovs offers several reasons to justify his delay. He explains that he wanted to preserve his anonymity until the FCA claim that was under seal was resolved. D. 101 at 4. He claims that if he filed the PSAC earlier, which identified him and all the relevant actors by name, and the FCA claim been unsuccessful, he easily could have been identified and left vulnerable to retaliation when the complaint was eventually unsealed. Id. at 5. Furthermore, Gusakovs explains that he was terminated after the filing of the complaint so he filed the FAC to include those allegations therein, but, in so doing, he used his sole opportunity to amend as a matter of course, pursuant to Fed. R. Civ. P. 15(a)(1). Id. In moving to amend the complaint now, Gusakovs claims that he "exercised his best judgment in balancing the need to amend with the wisdom of not seeking repeated amendments." Id. at 6. When determining whether delay is sufficiently undue, the Court must not consider the delay "in a vacuum," but rather "in the context of this case." Sheet Metal Workers, 305 F. Supp. 3d at 345. Here, while the time between the filing of the prior complaints and the motion to amend is considerable, Gusakovs proffered a facially plausible reason for his delay and moved to amend less than two months after the unsealing of the lawsuit.

Importantly, to the extent there is any prejudice to Defendants, it is minimal. While this case has been pending for years, it is still in its procedural infancy as discovery has not yet commenced, which weighs in favor of permitting amendment. See Gallerani v. Town of Plymouth, No. 01-cv-10551-GAO, 2003 WL 21696437, at *2 (D. Mass. May 1, 2003) (allowing motion to amend in part (citing Torres-Rios v. LPS Lab'ys., 152 F.3d 11, 16 (1st Cir. 1998)). Furthermore, Gusakovs has withdrawn six claims and one defendant, DePuy Synthes, Inc., that were included in the FAC. Compare D. 13 with D. 91-1; see D. 89; D. 90. While he did include

two new claims for intentional and negligent infliction of emotional distress, there is no prejudice

to Defendants as to those because, as explained below, they do not state a claim and are dismissed.

Finally, the new allegations in the PSAC either concern events that have happened since the filing

of the FAC (e.g., the April 2018 correspondence terminating his employment) or provide more

details about the events leading up to his alleged termination (e.g., the sterilization incidents).

Compare D. 13 with D. 91-1; see D. 98 at 5–6.[3]

Also, as the Court's analysis below makes plain, certain causes of action in the PSAC state

plausible claims for relief, which also tips the scale in favor of amendment.   Accordingly,

Defendants' arguments as to undue delay and prejudice do not warrant denial of the motion to

amend.

      2.     *Futility*

Futility turns on whether "the complaint, as amended, would fail to state a claim upon

which relief could be granted," so the appropriate standard is that of a Rule 12(b)(6) motion to

dismiss.  Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) (citations omitted).

      a)     Federal FCA Retaliation (Count I)

To state a claim for FCA retaliation, a plaintiff must plausibly allege "that 1) the

employee's conduct was protected under the FCA; 2) the employer knew that the employee was

engaged in such conduct; and 3) the employer discharged or discriminated against the employee

because of his or her protected conduct."  United States ex rel. Karvelas v. Melrose-Wakefield

---

[3] In support of their opposition to the motion to amend, Defendants argue that they will be
unduly prejudiced because Gusakovs seeks to relitigate expressly dismissed claims and includes
an allegation regarding Knaus's death in the PSAC, which, in Defendants' view, casts them in a
derogatory light.  D. 98 at 7–11; see D. 100 at 24–26; D. 102-2 at 8–10.  The Court addresses these
arguments fully below but notes here that they do not provide sufficient reason to deny the motion
to amend.

Hosp., 360 F.3d 220, 235 (1st Cir. 2004) (citing cases); Guilfoile v. Shields, 913 F.3d 178, 187-88 (1st Cir. 2019).  Here, Gusakovs has plausibly stated such a claim.

As to the first element, "an employee's conduct is protected where it involves acts done . . . in furtherance of an FCA action."  Karvelas, 360 F.3d at 236 (internal citations and quotation marks omitted).  In this context, conduct "in furtherance" of an action under the FCA is "conduct that reasonably could lead to a viable FCA action," such as "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government."  Id. at 236–37 (citation omitted).  This element is satisfied here because Gusakovs allegedly reported, among other things, Defendants' kickbacks to the Government, filed an FCA lawsuit relating, in part, to those kickbacks on behalf of the Government, the Government chose to intervene in relation to that claim, and the parties reached a settlement agreement as to same.  D. 62 at 1; D. 91-1 ¶¶ 2–3, 36; see United States v. Medtronic, Inc., 189 F. Supp. 3d 259, 280 (D. Mass. 2016) (explaining that "[relator's] complaints also involved concerns about kickbacks and other fraudulent conduct directed at physicians to encourage off-label use of Medtronic devices" and "[s]uch fraudulent conduct is exactly the sort of activity that 'reasonably could lead' to false claims by the objects of that conduct, and is thus protected conduct for purposes of the FCA" (citation omitted)).

The second element requires a plaintiff to plausibly allege that "the employer must be on notice that the employee is engaged in conduct that reasonably could lead to a False Claims Act case."  Karvelas, 360 F.3d at 238 (citations and internal quotation marks omitted).  However, "the employer need not know that the employee has filed or plans to file a qui tam action, nor even necessarily be aware of the existence of the FCA. . . .  Instead, the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged."  Id. (internal

citations and quotation marks omitted).  In other words, "[w]hat the employer must know is that the plaintiff is engaged in protected conduct, that is, investigation or other activity concerning false of fraudulent claims that the employer knowingly presented to the federal government."  Id. at 239 (citing cases).

Here, Gusakovs alleges that he reported the sterilization incidents to the J&J CIAD and RC in October 2016.  D. 91-1 ¶ 31.  After months of Defendants' alleged inaction as to his complaints, Gusakovs reported the kickbacks and sterilization incidents to the Government on May 22, 2017.  Id. ¶ 36.  Just days later, the Government interviewed Capobianco concerning the sterilization incidents and issued a subpoena to J&J seeking documents about such matters as well as "remuneration, such as payments, travel, entertainment or gifts, provided to BMC or health care providers affiliated with BMC" and documents relating to J&J's "compliance with the Anti-Kickback statute."  Id. ¶¶ 39, 41.  After Capobianco's interview with the FBI, he allegedly informed Gusakovs of same, suggesting that Capobianco knew it was Gusakovs that had "blown the whistle."  Id. ¶ 39.  The overlap between Gusakovs' prior complaints to Defendants and the subject matter of the subpoena also could suggest to Defendants that he had engaged in protected activity.  The Defendants' knowledge is further inferred because they wanted to inspect Gusakovs' smartphone and iPad in July 2017 to comply with "a government investigation regarding DePuy spinal implants," id. ¶ 51, all from which the Court can infer knowledge at this stage of litigation.  See Medtronic, Inc., 189 F. Supp. 3d at 280–81 (concluding "[defendant's] awareness of [whistleblower's] activity is more than plausible based on the allegation that he reported his concerns not only to [his manager], but also [defendant's subsidiary's] Human Resources and [defendant's] legal counsel"); United States ex rel. Provuncher v. AngioScore, Inc., No. 09-12176-RGS, 2012 WL 1514844, at *6 (D. Mass. May 1, 2012) (concluding knowledge was plausibly

alleged where whistleblower "spoke to several AngioScore employees, including his supervisor, . . . and AngioScore's regulatory compliance department, regarding his concerns about the safety of [the device]").

The final element concerns causation. In the FCA retaliation context, a "but-for" causation standard applies. Lestage v. Coloplast Corp., 982 F.3d 37, 41 (1st Cir. 2020). This is the only element Defendants challenge, and they offer several arguments in support thereof—none of which prove availing.

First, they argue that there is insufficient temporal proximity between Gusakovs' protected conduct and their alleged adverse employment action to support any inference that his protected conduct was a but-for cause for the alleged retaliation and termination. D. 97 at 13. As Defendants acknowledge, however, causation can be inferred from a close temporal proximity. Guilfoile, 913 F.3d at 194 (citation omitted). Defendants contend her that they learned of Gusakovs' protected activity in May 2017 and terminated him in January 2018—an eight-month period that, in Defendants' view, "far exceeds the days and weeks that courts typically recognize as being temporally proximate." D. 97 at 13. While it is true that days and weeks have been found to be sufficiently brief to support an inference of causation, see, e.g., Guilfoile, 913 F.3d at 194 (one week); Harrington v. Aggregate Indus.-Ne. Region, Inc., 668 F.3d 25, 32 (1st Cir. 2012) (72 hours); Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007) (two months), the inquiry is inherently fact-specific and longer periods have sufficed, see, e.g., Acevedo-Parilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 144 (1st Cir. 2012) (six months); Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) (three months); Cyr v. Hannaford Bros. Co. LLC, No. 2:17-cv-00321-GZS, 2019 WL 1140180, at *9 (D. Me. Mar. 12, 2019) (six months).

Nevertheless, a closer examination of the allegations, assumed to be true at this juncture, suggests that there was much less than an eight-month gap between Gusakovs' protected conduct and his termination. The PSAC states explicitly that "the exact termination date is unclear" and was in "late-2017 or early-2018." D. 91-1 ¶ 5. Indeed, the January 30, 2018 letter Gusakovs received concerning his 2017 year-end W-2 form, indicating that it was directed to "former and active" employees, did not indicate that this was the date of his termination; rather, it suggested that he had already been terminated on an undisclosed date. Id. ¶ 52. More importantly, initially reporting to the Government in May 2017 was not Gusakovs' only protected conduct. In addition, he filed this lawsuit in August 2017 and supported the Government's investigation into Defendants over the remaining months of 2017 and subsequent years. Id. ¶¶ 1–2. Accordingly, his protected conduct was ongoing at the time of his termination and the allegations reflect the close temporal proximity that can establish causation.

Second, Defendants argue that Gusakovs' allegations do not meet the "but-for" causation standard because the PSAC contains a non-pretextual reason for his termination: his short-term disability ended and he was never approved for long-term disability leave. D. 98 at 15–16; D. 100 at 12–13. Gusakovs, however, alleges he was terminated either in late-2017 or early-2018. D. 91-1 ¶¶ 5, 52, 55. If the actual reason he was terminated was that he was never approved for long-term disability leave, his application for same was denied on March 16, 2018 and his appeal of that denial was denied on May 31, 2018, id. ¶ 47; that is, potentially after he had already been terminated. This casts doubt on Defendants' argument that the denial of Gusakovs' long-term disability leave was the reason for his termination. Furthermore, Gusakovs alleges that he had received positive performance reviews, salary increases and bonuses, awards, commissions, and promotions while employed with Defendants, further supporting his allegations that he was

terminated due to protected conduct.  Id. ¶ 54; see United States ex rel. Gobble v. Forest Lab'ys., Inc., 729 F. Supp. 2d 446, 451 (D. Mass. 2010) (explaining that plaintiff "also alleges that he had received favorable evaluations; and salary increases prior to his complaints which further support the conclusion that he was impermissibly fired").  Accordingly, the Court concludes that Gusakovs also has plausibly stated the third element of this claim.

For these reasons, the PSAC states a claim for federal FCA retaliation and it is, therefore, not futile to amend the complaint.

b)  Massachusetts FCA Retaliation (Count II)

Plaintiffs seeking to state a MFCA retaliation claim must plausibly allege that "(1) she engaged in conduct protected by the MFCA; (2) her employer knew that she was engaged in that conduct; and (3) her employer took an adverse employment action against her because of the protected conduct."  Shepperd v. 265 Essex St. Operating Co., LLC, 299 F. Supp. 3d 278, 284 (D. Mass. 2018); Mass. Gen. L. c. 12, § 5J(2).  Such claims are evaluated under the same standards as the federal FCA.  United States ex rel. Karvelas v. Tufts Shared Servs., Inc., 433 F. Supp. 3d 174, 181 (D. Mass. 2019) (noting that "the MFCA was modeled on the similarly worded [FCA]") (citation and internal quotation marks omitted).

Here, Gusakovs' MFCA claim rests upon the same allegations that undergird his federal FCA claim.  Compare D. 91-1 ¶¶ 61–64 with id. ¶¶ 65–68.  As the Court has already concluded he states a claim under the federal FCA, so too does he under the MFCA.  See United States ex rel. Hagerty v. Cyberonics, Inc., 95 F. Supp. 3d 240, 273–74 (D. Mass. 2015) (denying dismissal of a federal FCA retaliation claim and then denying dismissal of MFCA retaliation claim "[b]ecause state acts such as the MFCA are construed consistently with the federal FCA"), aff'd sub nom. Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26 (1st Cir. 2016); United

States ex rel. Willette v. Univ. of Mass., 80 F. Supp. 3d 296, 304 & n.9 (D. Mass. 2015) (analyzing and dismissing federal and Massachusetts claims simultaneously and noting that "[t]he retaliation provision of the MFCA is nearly identical with respect to the scope of protected conduct" under the federal FCA).  Accordingly, Count II in the PSAC, the MFCA claim, is not futile.

c)      Wrongful Termination in Violation of Public Policy (Count III)

In Count III of the PSAC, Gusakovs alleges that he was wrongfully terminated in violation of public policy.  In Massachusetts, an at-will employee can be fired at any time "for almost any reason or for no reason at all."  Wright v. Shriners Hosp. for Crippled Child., 412 Mass. 469, 472 (1992) (citation and internal quotation marks omitted).  Accordingly, to state a cognizable claim, Gusakovs must plausibly allege that his discharge falls within the limited exception prohibiting employers from firing at-will employees "for reasons that violate public policy."  Flesner v. Tech. Commc'ns Corp., 410 Mass. 805, 810 (1991).  For example, terminating an at-will employee for asserting a protected right (e.g., filing for workers' compensation), refusing to commit an illegal act (e.g., perjury) or for doing what the law requires (e.g., serving on a jury) violates public policy. Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. 145, 149–50 (1989) (citing cases).  For other examples, employees are protected from termination when they make "an internal complaint . . . about the alleged violation of the criminal law," Shea v. Emmanuel Coll., 425 Mass. 761, 762–63 (1997), and when they "report, resist, or refuse to participate in activity that presents a threat to public health or safety," Surprise v. Innovation Grp., Inc., 925 F. Supp. 2d 134, 148 (D. Mass. 2013) (citing cases).

A cause of action for wrongful termination in violation of public policy, however, is inapplicable where "there is a comprehensive remedial statute, [and] the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial

18

scheme." <u>Perez v. Greater New Bedford Vocational Tech. Sch. Dist.</u>, 988 F. Supp. 2d 105, 113 (D. Mass. 2013) (alteration in original) (quoting <u>Melley v. Gillette Corp.</u>, 19 Mass. App. Ct. 511, 513 (1985), <u>aff'd</u>, 397 Mass. 1004 (1986)) (internal quotation marks omitted).  Defendants argue that the FCA is the operative comprehensive remedial statute, which serves to bar Gusakovs' common law claim for wrongful termination in violation of public policy.  D. 97 at 21–24; D. 98 at 17–18; D. 100 at 21–22; D. 102-2 at 4–5.  To the extent the common law wrongful termination claim is based upon the related FCA violations (i.e., kickbacks to Tannoury), Defendants are correct.  <u>See</u>, <u>e.g.</u>, <u>Guilfoile v. Shields Pharm., LLC</u>, No. 16-cv-10652-DJC, 2021 WL 4459515, at *7 (D. Mass. Sept. 29, 2021) (stating "[w]here, as here, the federal statute provides a remedy . . . for termination [the] public policy exception . . . is not called into play.  Thus, to the extent that the common law wrongful termination claim [] based on Guilfoile's claim related to violation of the FCA, Corporate Defendants are entitled to summary judgment on same" (second alteration in original) (internal citations and quotation marks omitted); <u>Dineen v. Dorchester House Multi-Serv. Ctr., Inc.</u>, No. 13-12200-LTS, 2014 WL 458188, at *4–5 (D. Mass. Feb. 3, 2014) (similar).

The PSAC, however, also alleges that he was terminated for activities not related to FCA violations, such as reporting Defendants' alleged failure to properly sterilize surgical tools and equipment.  D. 91-1 ¶¶ 31–34, 36–38, 70.  To the extent Gusakovs' wrongful termination claim is based upon these sterilization incidents and the reporting of same, the FCA does not provide a comprehensive statutory remedy and Defendants have not proffered any other statutory scheme that would serve to bar his claim.  Accordingly, Gusakovs has stated a wrongful termination claim and his proposed amendments are not futile.  <u>See</u>, <u>e.g.</u>, <u>Elliot-Lewis v. Abbott Lab'ys., Inc.</u>, No. 14-cv-13155-IT, 2018 WL 1122359, at *1 (D. Mass. Mar. 1, 2018) (denying motion to dismiss wrongful termination claim because "[i]f Plaintiff's state law claim was based on the alleged

reporting of a false claim for payment, it would be foreclosed," but "her state law claim relates to retaliation for her reports concerning public welfare, as protected by regulations prohibiting medical device off-label and pre-approval promotion" which were not); Falcon v. Leger, 62 Mass. App. Ct. 352, 364 (2004) (affirming jury verdict where the plaintiff, who worked for a company that manufactured wire and cable, was found to have been terminated for refusing to comply with a supervisor's order to lie to an inspector concerning the whereabouts of wire products she had found to be non-conforming on two prior inspection visits and explaining that "[o]ur cases have suggested that an employee could be shielded from the risk of discharge if he or she reasonably, but perhaps erroneously, reports that an employer is violating State and municipal laws and ordinances concerning public safety" (citing cases)).

> d)   Breach of the Implied Covenant of Good Faith and Fair Dealing (Count IV)

To state a claim for breach of the implied covenant of good faith and fair dealing in this context, a plaintiff must plausibly allege: "(1) status as an at-will employee; (2) termination of employment; (3) termination without good cause or in bad faith; and (4) termination with the purpose of depriving an employee of benefits to which he is entitled." Fine v. Guardian Life Ins. Co. of Am., 450 F. Supp. 3d 20, 33 (D. Mass. 2020) (citation and internal quotation marks omitted). Gusakovs fails on the final element.

Defendants argue that nowhere in the PSAC does Gusakovs allege that he was terminated to deprive him of benefits to which he is entitled. D. 98 at 18–19; D. 100 at 15–17; D. 102-2 at 5. Gusakovs responds that the PSAC contains sufficient allegations because it includes allegations in paragraph fifty-four regarding "a $9,000 'Leadership Award' in July 2017 (which was never paid)" and "a 0.5% commission on the aggregate sales by Defendants' Boston-area group beginning in or about October 2017 (which was never paid)." D. 91-1 ¶ 54; D. 101 at 14. This sole paragraph

does not satisfy Gusakovs' burden.  Nowhere in this paragraph does he attempt to tie the allegedly unpaid Leadership Award and sales commission to his termination.  Indeed, as Defendants point out, the PSAC itself refutes any causal connection between his termination and these allegedly unpaid benefits because, in its description of this cause of action, it specifically alleges that he was terminated due to his reporting activities.  D. 91-1 ¶ 75.  Without any causal connection plausibly alleged, Gusakovs fails to state a claim and the proposed amendment as to this cause of action is futile.  See, e.g., Mehic v. Dana-Farber Cancer Inst., Inc., No. 15-cv-12934-IT, 2017 WL 637681, at *7 (D. Mass. Feb. 16, 2017) (dismissing claim for breach of the implied covenant of good faith and fair dealing because "there are no facts plausibly suggesting that [the defendant] terminated plaintiff to avoid payment of rightfully earned compensation for past work"); Wong v. Resolve Tech., No. 10-11642-DJC, 2011 WL 3157198, at *6 (D. Mass. July 25, 2011) (explaining that "Wong makes no allegation in the complaint [that defendant terminated her employment to avoid payment of past services or benefits earned but not received] and the analysis, accordingly, could stop there").

e)      Breach of Contract (Count V)

To state a breach of contract claim, a plaintiff must plausibly allege "(1) the existence of a valid contract; (2) that it has performed its obligations under the contract; and (3) a breach of the contract that causes damages."  Lombard Med. Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432, 438 (D. Mass. 2010).  "[A] complaint must describe the alleged terms of the contract with enough specificity to provide a defendant with the requisite notice of the nature of the claim.  Thus, a claim for breach of a written contract must either (1) quote pertinent contractual language; (2) contain a copy of the contract as an attachment; or (3) summarize the contract's purported legal effect."  Foss v. Marvic, 365 F. Supp. 3d 164, 167 (D. Mass. 2019).

Here, Gusakovs has not quoted pertinent contractual language, attached a copy of the contract, or summarized the contract's purported legal effect. To the contrary, the PSAC contains only two allegations related to his breach of contract claim: (1) "Defendants and Plaintiff are parties to a contract entitled the 'Stock Option and Incentive Plan' (the 'Plan'). Under the terms of the Plan, Plaintiff's outstanding stock options should have become fully exercisable. Defendants prevented Plaintiff from exercising his rights under the Plan and thereby breached the contract between them;" and (2) "As a result of Defendants' contract breach, Plaintiff has suffered monetary damages." D. 91-1 ¶¶ 78–79. These barebone allegations, however, do not provide sufficiently plausible information regarding the contract to determine if it was breached. For example, "[t]here is nothing else in the complaint about the alleged options contract, or the obligations of either party, including whether the options had vested, in whole or in part, at the time she exercised (or attempted to exercise) them." Madden v. Ascensus Coll. Savings Recordkeeping Servs., LLC, No. 20-10565-FDS, 2021 WL 231298, at *5 (D. Mass. Jan. 22, 2021). These allegations also fail to address "when the contract was created, or whether it was oral or written." Id. Assuming this alleged contract was written, "it is not described or quoted, and it is not attached to the complaint. Nor are there any specifics as to the alleged breach, such as when []he exercised or attempted to exercise the options, and what happened as a result. The complaint is therefore missing the most basic information as to the terms of the alleged contract and the nature of the breach." Id.

Gusakovs' only reply is that the contract was not provided to him by Defendants as part of his recently produced personnel file, and that the claim should not be dismissed now because if discovery fails to provide evidence to support the claim, Defendants can challenge the claim at summary judgment. D. 101 at 14–15. These arguments are unavailing. As an initial matter, even

if Gusakovs is not in possession of the contract, he still could have provided some details, such as an estimate as to when the options would have become exercisable or whether it was all his options or simply a portion of them.  Furthermore, "the mere possibility that information disclosed during discovery may show a basis for liability cannot act as a substitute for sufficiently pleaded factual allegations."  Ward v. Auerbach, No. 16-12543-FDS, 2017 WL 2724938, at *7 (D. Mass. June 23, 2017) (citing cases).

Without any further allegations as to the contract, its terms, or the nature of the breach, Gusakovs has failed to state a breach of contract claim in the PSAC.  See, e.g., Buck v. Am. Airlines, Inc., 476 F.3d 29, 38 (1st Cir. 2007) (affirming dismissal of contract claim because "[i]n a contract action, this irreducible minimum requires the pleader to explain what obligations were imposed on each of the parties by the alleged contract" and "plaintiffs failed to achieve that benchmark" (citation and internal quotation marks omitted)); Hogan v. Teamsters Loc. 170, 495 F. Supp. 3d 52, 58 (D. Mass. 2020) (explaining that the complaint must "at least" identify "what obligations were imposed on each of the parties by the alleged contract" and describe with "substantial certainty the specific contractual promise the defendant failed to keep" (internal citations and quotation marks omitted)).

f)    Intentional Infliction of Emotional Distress (Count VI) and
Negligent Infliction of Emotional Distress (Count VII)

In the final two counts of the PSAC, Gusakovs alleges intentional and negligent infliction of emotional distress.  Defendants contend that they fail to state a claim and that they are barred by the exclusivity provision of the Massachusetts Worker's Compensation Act ("WCA").  D. 98 at 11–14; D. 100 at 19–20, 22–24; D. 102-2 at 6–8.  The Court does not reach the latter, because even assuming these claims are not preempted by the WCA, they still fail to state a claim.

To state a claim of intentional infliction of emotional distress under Massachusetts law, a plaintiff must show:  "(1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it."  Limone v. United States, 579 F.3d 79, 94 (1st Cir. 2009) (alteration in original) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144–45 (1976)).  "The standard for making a claim of intentional infliction of emotional distress is very high."  Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996) (citing Agis, 371 Mass. at 145).  Conduct is "extreme and outrageous" if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (quoting Restatement (Second) of Torts § 46, comment d (1965)) (internal quotation mark omitted).  Recovery for such a claim generally "requires more than that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  Doyle, 103 F.3d at 195 (quoting Foley, 400 Mass. at 99) (internal quotation marks omitted).

Gusakovs' intentional infliction of emotional distress claims fails for, at least, two reasons. First, the PSAC does not plausibly allege that Defendants' alleged actions were intended to cause him emotional distress.  The only allegation to that effect can be found at the end of the PSAC in its description of the cause of action, which alleges "Defendants' conduct as alleged herein was

extreme and outrageous; and when Defendants engaged in that conduct, they intended, knew, or should have known that their conduct would cause severe emotional distress to Plaintiff." D. 91-1 ¶ 81. This conclusory allegation, however, is belied by the PSAC itself, which states throughout that Defendants were allegedly motivated by their desire to retaliate against Gusakovs for his reporting to the Government, not by any desire to cause him emotional distress. Id. ¶¶ 4, 53, 62–63, 66–67, 70, 75. Without any plausible factual allegations to this requisite element of the claim, Gusakovs' intentional infliction of emotional distress claim fails. See, e.g., Alexandre v. Colannino, No. 22-cv-11342-DJC, 2023 WL 2072397, at *5 (D. Mass. Feb. 16, 2023) (concluding intentional infliction of emotional distress claim failed because "the proposed second amended complaint contains no allegations that Defendants' alleged actions were directed at Alexandre and intended to cause him emotional distress" (citing cases)); Agis, 371 Mass. at 144–45 (requiring "that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct" to state a claim (citations omitted)).

Second, even assuming *arguendo* Defendants had such intent and knowledge, Gusakovs has not alleged any actions on their part that would satisfy the high standard for extreme and outrageous conduct. As an initial matter, many of the actions alleged in the PSAC that caused him emotional distress were not committed by Defendants. D. 91-1 ¶¶ 38, 42 (alleging that BMC summoned Gusakovs and demanded information regarding the May 2017 sterilization incident, "threatening him that if he did not cooperate he too would be banned from the hospital," which caused him "anxiety, worry, and distress"); id. ¶ 48 (alleging that "Capobianco asked Plaintiff about his family in an odd manner that Plaintiff interpreted as being threatening" and that "Capobianco also visited Plaintiff at BMC, despite his having been banned from the hospital"). At bottom, the only extreme and outrageous conduct attributable to Defendants alleged in the

PSAC is the retaliatory termination.  Such conduct, however, is not sufficiently extreme and outrageous to state a claim for intentional infliction of emotional distress.  See, e.g., Young v. Shaw's Supermarkets, Inc., No. 2:18-cv-00320-JDL, 2020 WL 2475875, at *6 (D. Me. May 13, 2020) (explaining that "[i]n the context of intentional infliction of emotional distress, employment terminations—even baseless, discriminatory and/or humiliating ones—have been held as a matter of law to constitute an insufficient predicate for a claim against an employer" (citation and internal quotation marks omitted)); Orell v. UMass Mem'l Med. Ctr., 203 F. Supp. 2d 52, 70 (D. Mass. 2002) (concluding that employer's failure to make accommodations for employee's disability and termination based on disability do not support a claim for intentional infliction of emotional distress); Harris v. Leboeuf, Lamb, Greene & Macrae, LLP, No. 99 Civ. 12374 JSM, 2000 WL 1855111, at *4 (S.D.N.Y. Dec. 19, 2000) (explaining that "[w]rongful termination, even for retaliatory and discriminatory reasons in violation of various state and federal laws, does not satisfy the standard for intentional infliction of emotional distress" (citation and internal quotation marks omitted)).

To state a claim for negligent infliction of emotional distress, a plaintiff must plausibly allege five elements:  "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by object symptomatology, i.e., objective corroboration of the emotional distress alleged; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case."  Brooks v. Martha's Vineyard Transit Auth., 433 F. Supp. 3d 65, 77 (D. Mass. 2020) (citing Rodriguez v. Cambridge Hous. Auth., 443 Mass. 697, 701 (2005)). Gusakovs stumbles at the first element.

"As with any sort of negligence, negligence in the context of an emotional distress claim requires that the defendant have owed plaintiff a duty of care that was breached in some way."

Delmonte v. Laidlaw Env't Servs., Inc., 46 F. Supp. 2d 89, 96 (D. Mass. 1999) (citing Urman v. S. Bos. Sav. Bank, 424 Mass. 165, 171 (1997)).   Here, however, the PSAC and Gusakovs' opposition are silent as to which duty Defendants owed him and which of their actions breached that duty.   See generally D. 91-1; D. 101.   Without such allegations, Gusakovs' claim necessarily fails.   See, e.g., Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 239 (1st Cir. 2013) (affirming dismissal of negligent infliction of emotional distress claim where plaintiff's "opening brief fails to address the question of duty at all"); Lockwood v. Madeiros, No. 4:18-cv-40143-DHH, 2018 WL 4087938, at *9 (D. Mass. Aug. 27, 2018) (concluding insufficient likelihood of success as to claim for negligent infliction of emotional distress where plaintiff does not "allege that either defendant owed her a duty of care that was breached").

To the extent that Gusakovs might try to rely on the employer-employee relationship to such duty, there is caselaw that such allegations would not state a plausible claim for negligent infliction of emotional distress.   See, e.g., Young, 2020 WL 2475875, at *7 (explaining that "[t]he claim of negligent infliction of emotional distress requires the existence of a 'special relationship' that creates a duty between the actor and the person who is emotionally harmed. . . .  The employer-employee relationship does not qualify as a special relationship for purposes of negligent infliction of emotional distress" (internal citations and quotation marks omitted)); Duggan v. Celata Eng'g, No. 91-7844, 1994 Mass. Super. LEXIS 568, at *5 (Super. Ct. Apr. 8, 1994) (stating that "[u]pon a review of the Massachusetts cases on negligent infliction of emotional distress and employment at will, the court concludes that as a matter of law a termination of an employment at will cannot alone be the basis for a claim of negligent infliction of emotional distress (citing cases)).

Accordingly, Gusakovs has not plausibly alleged either emotional distress claim and his proposed amendments as to these claims are futile.

In sum, the motion to amend is not futile as to Count I for federal FCA retaliation; Count II for MFCA retaliation; and Count III for wrongful termination in violation of public policy, insofar as it relates to sterilization incidents and the reporting of same. As such, the motion to amend, D. 91, is ALLOWED in part to the extent that Gusakovs asserts those claims, but Defendants' motion to dismiss the remaining claims in the PSAC is ALLOWED.[4]

### B.      Motion to Strike Allegations in the PSAC

As to Defendants' motion to strike, they argue that the allegations found in paragraphs eighteen through twenty-seven of the PSAC regarding kickbacks to Tannoury mirror allegations included in the FAC and should be struck because they were dismissed with prejudice in the Settlement Agreement. D. 100 at 24–25; D. 102-2 at 8–9. They also argue that the allegation regarding Knaus's death (alleging that "one day after the FBI interviewed Capobianco, his supervisor Knaus was found dead of a suspected drug overdose," D. 91-1 ¶ 40) is immaterial to the case and improperly casts Defendants in a derogatory light by suggesting that they knew something about the circumstances of Knaus's death or that his death is somehow connected to Gusakovs' protected conduct. D. 100 at 25–26; D. 102-2 at 9–10.

"Under Rule 12(f), a party may move to strike 'from any pleading any . . . redundant, immaterial, impertinent, or scandalous matter.'" Dennison v. LaPointe, No. 06-40100-FDS, 2006 WL 3827516, at *1 (D. Mass. Dec. 29, 2006) (quoting Fed. R. Civ. P. 12(f)). While striking allegations is "within the sound discretion of the court," Newman v. Commonwealth of Mass., 115 F.R.D. 341, 343 (D. Mass. 1987), "[s]uch motions are, however, 'narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion,'" Sheffield v. City of Boston,

---

[4] In light of the Court's ruling allowing the motion to amend in part to allow these claims in the PSAC, Defendants' motion to dismiss the FAC or, in the alternative, to strike certain allegations, D. 96, is DENIED as moot.

319 F.R.D. 52, 54 (D. Mass. 2016) (quoting Boreri v. Fiat, S.P.A., 763 F.2d 17, 23 (1st Cir. 1985)).

In assessing whether a motion to strike should be granted, the Court must bear in mind that such

motions are rarely granted absent a showing of prejudice to the moving party.  See Ross-Simons

of Warwick, Inc. v. Baccarat, Inc., 182 F.R.D. 386, 398 (D.R.I. 1998) (explaining that "[m]ere

redundancy is insufficient to support a motion to strike" but that "the movant must demonstrate

that prejudice would result if the offending material remained in the pleadings").

Defendants have not sufficiently demonstrated that striking the allegations regarding

alleged kickbacks to Tannoury is warranted.  At bottom, their only argument in support of same is

that these allegations were dismissed in the Settlement Agreement and the Court's subsequent

Order implementing that portion of the agreement.   D. 100 at 24–25; D. 102-2 at 8–9.   The

Settlement Agreement, however, dismissed claims, not particular allegations related to multiple

claims.  See Settlement Agreement at 12 (stating, in relevant part, that all claims in the Civil Action

shall be dismissed with prejudice as to the [Gusakovs], except any claims specifically reserved in

paragraph 7 of this Agreement").   While Defendants suggest these allegations are not "needed to

form the basis of his employment retaliation claims," D. 100 at 25, those claims are based upon

his reporting of the kickbacks as part of the basis of Defendants' alleged retaliation, so they

necessarily provide relevant factual background.  Accordingly, the Court declines to strike these

allegations from the PSAC.

The Court, however, reaches a different conclusion as to the allegation regarding Knaus's

death.  While there is a "very high threshold for granting a motion to strike," Leader v. Harv. Univ.

Bd. of Overseers, No. 16-10254-DJC, 2017 WL 1064160, at *7 (D. Mass. Mar. 17, 2017),

scandalous matter may be struck where it "improperly casts a derogatory light on someone,"

Gauthier v. United States, No. 4:10-40116-FDS, 2011 WL 3902770, at *12 (D. Mass. Sept. 2,

2011) (citation omitted).  Here, Gusakovs has provided no basis for the occurrence or timing of Knaus's death to be relevant to his claims.  Indeed, he argues that "[t]he fact that Knaus died the day after Capobianco's FBI interview might be a coincidence and it might also be evidence that the game was up and Knaus knew it."  D. 101 at 21.  This argument, however, does not address how the circumstances or timing of Knaus's death relate to Defendants' allegedly retaliatory employment actions and the Court strikes ¶ 40 from the PSAC.

Accordingly, Defendants' motion to strike allegations is DENIED in part and ALLOWED in part.  D. 99.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Gusakovs' motion to amend for leave to file the PSAC, D. 91; DENIES as moot Defendants' motion to dismiss the FAC or, in the alternative, to strike certain allegations, D. 96; DENIES Defendants' motion to dismiss the PSAC as to Count I for federal FCA retaliation; Count II for MFCA retaliation; and Count III for wrongful termination in violation of public policy, insofar as it relates to sterilization incidents and the reporting of same, D. 99, and ALLOWS it as to all remaining claims, id.; and DENIES in part Defendant's motion to strike certain allegations in the PSAC as to the kickbacks allegations, and ALLOWS it in part as to the allegation regarding Knaus's death, id.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge